983 A.2d 604 (2009)
410 N.J. Super. 510
ALPERT, GOLDBERG, BUTLER, NORTON & WEISS, P.C., n/k/a Alpert Butler & Weiss, P.C., Plaintiff-Respondent,
v.
Michael QUINN, Marita Quinn and Quinn-Woodbine Realty & Leasing Co., L.L.C., Defendants-Appellants.
No. A-5503-07T2
Superior Court of New Jersey, Appellate Division.
Argued October 15, 2009.
Decided November 24, 2009.
*608 Marita Quinn, appellant, argued the cause pro se.
Clark E. Alpert, West Orange, argued the cause for respondent (Alpert Butler & Weiss, P.C., attorneys; Mr. Alpert, of counsel and on the brief; David N. Butler, Jeremy G. Weiss and Matthew C. Capozzoli, on the brief).
Before Judges STERN, GRAVES and LYONS.
The opinion of the court was delivered by LYONS, J.A.D.
This case focuses on the attorney-client relationship, especially its bedrock, the retainer agreement. It is a unique and extraordinary association. The attorney-client relationship has been a fertile source for authors over the years. It has spawned books, poems, plays, and movies. Literature on this topic includes fiction and non-fiction, tragedies and comedies. To resolve this case, we are obligated to review the long-established statements and principles of law concerning the attorney-client relationship and to analyze, in particular, the attorney's obligation to his potential client in finalizing a retainer agreement. The dramatis personae in this saga are plaintiff, Alpert, Goldberg, Butler, Norton & Weiss, P.C. (A.G.),[1] attorneys who formerly represented defendants, Michael Quinn, Marita Quinn (the Quinns), and Quinn-Woodbine Realty & Leasing Co., L.L.C. (Quinn-Woodbine),[2] and Clark E. Alpert (Alpert), the managing attorney of A.G.
The Quinns appeal from six orders entered by the trial court which culminated in two judgments against them and in favor of plaintiff in the aggregate amount of $163,745.93.

*609 A.

The following factual and procedural history is relevant to our consideration of the issues advanced on appeal. This case emanates from litigation between the Quinns and Quinn-Woodbine and the Banc of America Leasing & Capital, L.L.C. The Quinns were involved in two related post-judgment actions with the Banc of America. Both cases were venued in Cape May County. On December 29, 2005, Marita Quinn wrote a letter to Alpert and retained A.G. to consult on whether the counsel for Banc of America had committed professional ethics violations. Marita Quinn also expressed her concern that the Quinns' then-current counsel in the Banc of America litigation "had not been aggressive enough in informing the court" of the opposing counsel's allegedly unethical action. A.G. was paid $1,000 for its opinion.
On January 4, 2006, Alpert stated that he could not give comprehensive advice regarding the Banc of America counsel's conduct without being familiar with all the facts, though he did suggest exploring the possibilities that "their counsel fees were unreasonable." Alpert also addressed the Quinns' then-current litigation counsel's strategy and obligation to the Quinns.
On January 6, 2006, A.G. sent the Quinns a retention letter to confirm that the Quinns had retained the firm to represent them in the two Cape May matters on an hourly basis. The retention letter called for a $25,000 advance retainer on execution. The letter provides that:
[w]e charge on an hourly basis, less a ten percent fee discount if you pay timely (my present hourly rate, before applying the discount, is $375; associates began [sic] at $225; and paralegal time is $95). Examples of billable services include telephone calls, inter-office conferences, review of files and documents, court and deposition appearances, and travel time. We also charge for expenses, including out-of-pocket expenses, as well as "in-house" items such as copying. Details on any of these items and our policies will be provided to you upon request; whether or not you request them, you will be bound by our standard billing practices and firm policies in these and other regards, so feel free to ask.
[(Emphasis added).]
On January 9, 2006, before the Quinns had signed the proffered retainer agreement, they sent the firm a letter in which they stated that they expected the firm to represent them regarding the underlying issues between them and the Banc of America.
On January 25, 2006, the firm sent another retention letter to the Quinns. That letter called for a $10,000 advance retainer to retain the firm on an hourly basis to analyze, but not to appear in, the two Cape May Banc of America matters. That letter contained the same language regarding the firm's billing practices as set forth above. The Quinns executed the January 25, 2006, retainer letter, but they did not receive or request the billing details in A.G.'s "standard billing practices and firm policies" (A.G.'s Master Retainer) at that time.
On February 9, 2006, the Quinns signed the January 6, 2006, retention letter in which they agreed to pay a $25,000 retainer. Again, the Quinns did not request or receive A.G.'s Master Retainer referred to in the retainer agreement, when they signed the agreement on February 9, 2006.
Approximately seven months later, after a dispute arose between the Quinns and A.G. regarding the handling of the Banc of America matters and related billing issues, the Quinns requested, for the first time, *610 A.G.'s Master Retainer referred to in the January 6, 2006, retainer letter.
A.G.'s Master Retainer consists of eighteen single-spaced, typewritten pages and covers various issues regarding the attorney-client relationship. It contains a number of provisions of particular importance in this case. A.G.'s Master Retainer provides that: if the firm withdraws from a client's matter and is further entangled with the client, its time will be billable to and payable by the client, together with expenses; the initial advance retainer would be placed in the firm's general operating account rather than its trust account "because of the ongoing cash flow drain this file will engender"; balances owed and unpaid beyond thirty days will bear interest at the rate of twelve percent per annum; if there is a fee dispute or any proceedings relating to or arising from A.G.'s fees and expenses, the client will continue to pay the hourly fees and expenses for any time and expense that continues to be incurred by the firm by virtue of any fee dispute or related proceedings; the client will pay fees for any time and expense incurred by the firm in seeking to be relieved of counsel and dealing with any successor firm; photocopying charges are to be billed at twenty-five cents per page; and "extraordinary secretarial overtime" will be billed at $50 an hour. Another significant provision in A.G.'s Master Retainer is that no bills will be discounted unless the client agrees not to challenge any of the items billed in the "traditional" manner.
Trial in the underlying Cape May Banc of America matters was initially scheduled for April 2006, but it was ultimately postponed until January 2007. On August 28, 2006, however, A.G. notified the Quinns that they would have to pay a $50,000 additional retainer by September 16, 2006, in advance of the then-scheduled September 25, 2006, trial date. Discussions and disagreements resulted. In early October, the Quinns informed the firm that they had retained local counsel in Cape May to try the case, but the firm still demanded a $50,000 advance retainer.
On October 13, 2006, A.G. faxed to the Quinns its September 2006 invoice, which totaled $37,450. In the approximately eight months between January 2006 through September 2006, the firm had billed and received from the Quinns $183,565.78. Upon receipt of the September invoice, the Quinns alleged that it contained a number of unfair billing entries.
As a result of disputes between the parties, A.G. filed a motion to be relieved of counsel on October 18, 2006. The Quinns initially refused to consent to the application but then agreed. The trial court in the Banc of America matters granted the firm's motion to withdraw as counsel at the end of October 2006.
On November 17, 2006, our Supreme Court denied the firm's request to withdraw as counsel for the Quinns regarding a petition for certification that had been filed in the litigation with Banc of America. The Court ordered the firm to file the petition. The firm did not do so, but it ultimately charged the Quinns $14,885.60 for the services it had already performed regarding the petition.
On January 29, 2007, the firm sent a pre-action notice pursuant to Rule 1:20A-6 and N.J.S.A. 2A:13-6 to defendants, together with the notice of their right to fee arbitration and copies of its bills for September, October, November, and January. These bills amounted to $75,506.68.[3]
*611 On March 16, 2007, the firm filed a complaint demanding the Quinns and Quinn-Woodbine pay $75,712.93 in fees and expenses, plus collection fees.
Defendants were served with the complaint, a request for admissions, and document demands on April 11, 2007. Defendants did not respond to plaintiff's request for admissions. However, the Quinns, appearing pro se, filed an answer to the complaint on May 16, 2007. Also, on May 16, 2007, they filed a counterclaim which alleged professional negligence and breaches of duty by A.G. Defendant Quinn-Woodbine did not answer plaintiff's complaint and, on May 18, 2007, default was entered against it. Quinn-Woodbine filed a motion to vacate the default on June 1, 2007. The trial court denied that application without prejudice on June 22, 2007.
On June 12, 2007, A.G. filed an answer to the Quinns' counterclaim. One of the separate defenses raised was that the Quinns' claim did not conform with the requirements of the Affidavit of Merit statute, N.J.S.A. 2A:53A-26 to -29.
Because A.G. filed its answer on June 12, 2007, an affidavit of merit was required to have been filed on or before August 12, 2007, absent an extension. An affidavit of merit has never been filed in this case nor has a case management conference been held pursuant to Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 836 A.2d 779 (2003).
Plaintiff moved for summary judgment on July 20, 2007. It sought judgment in the amount of $105,407.42. This sum was arrived at by adding to the total of the September, October, November, and January bills, $75,506.68, an additional amount for "collection fees" incurred since then. The firm represented itself in the action. Its summary judgment application alleged that the firm's retainer agreement required defendants to pay, in addition to the outstanding legal fees on the Banc of America case, collection costs, "withdrawal costs," and interest. Alpert, acting as A.G.'s expert, filed an accompanying certification in support of the summary judgment, in which he set forth his opinion that the firm's fees were reasonable.
On September 10, 2007, the Quinns filed a response in opposition to the motion for summary judgment. They argued that the firm could not demand payment of its withdrawal and collection fees because the fees were not specified in the retainer agreement which they signed. In the Quinns' certification in opposition, they argued that the bills were inflated and erroneous. They attached to their certification copies of the bills and the items which they deemed questionable.
On September 13, 2007, the trial court requested that the Quinns provide documentation of the firm's alleged double billing. The Quinns provided documentation of duplicate charges in the firm's second September 2006 invoice, on September 14, 2007. On September 15, 2007, A.G. filed a reply certification in support of summary judgment in which it agreed, for the purpose of the motion, to waive $4,954 of its claim and to deduct $3,360 of its claim outright as a billing error.
On September 23, 2007, the trial court requested the firm provide an itemization of A.G.'s claim for $9,800 in fees and costs in connection with its motion for summary judgment. The firm replied on September *612 26, 2007, with an invoice outlining its costs and fees.
On October 3, 2007, the Quinns filed a "motion for leave to file a supplemental pleading." The motion was supported by a certification which claimed that the firm had made errors in representing the Quinns in the lawsuits against Banc of America. On October 9, 2007, apparently without oral argument, the trial court granted the firm's motion for summary judgment in the amount of $97,552.42.
In the trial court's oral decision, it noted that the January 6, 2006, retainer agreement expressly incorporated A.G.'s Master Retainer. The court went on to note that the retainer agreement was an "arm's length agreement" and that it should be upheld. The trial court found that the Quinns had not produced an expert to challenge the amount of fees sought as unreasonable. It held that the Quinns' claims were unsupportable and they did not defeat the presumption that the fees were reasonable.
The trial court addressed the Quinns' argument that the January 6 and January 25, 2006, retainer agreements "were of little resemblance to the long form retainer agreement of which they were made aware of" on October 9, 2006. The court said that both agreements made reference to A.G.'s Master Retainer and that it would be readily supplied if asked for by the Quinns. The trial court concluded "the mere assertion by the Quinns that it never occurred to them to inquire is without merit." The trial court, however, did not address defendants' counterclaim in its summary judgment decision.
On October 10, 2007, the Quinns filed a "Notice of Motion to Amend Opposition to Summary Judgment under Rule 4:9-1." The exhibits and accompanying certifications from the Quinns extensively annotated the bills which the firm had provided. The Quinns set forth explanations of how they believed they were overcharged. They, however, did not provide an expert's certification to support their claims nor did they produce documents that were significantly different from those produced in their previous pleadings. On October 18, 2007, plaintiff sent defendants a letter demanding they withdraw their pending October 3, 2007, and October 10, 2007, motions as frivolous.
On October 27, 2007, the trial court denied defendants' October 10, 2007, motion to amend their opposition to the motion for summary judgment as untimely, given that summary judgment had been granted on October 9, 2007.
On October 29, 2007, the trial court dismissed defendants' October 3, 2007, motion to file a supplemental pleading and dismissed defendants' counterclaims with prejudice. The trial court, in exercising its discretion to dismiss the Quinns' motion to file a supplemental pleading, stated that the motion was untimely and an improper "disguised attempt to collaterally challenge the order for summary judgment" because it was being submitted after the summary judgment had been granted. The court also noted that the Quinns had failed to file an expert's affidavit of merit regarding plaintiff's alleged malpractice as required by the Affidavit of Merit statute.
On November 2, 2007, the Quinns filed a "motion for reconsideration" of the October 9, 2007, summary judgment order supported with a certification. On November 7, 2007, plaintiff filed a certification in opposition to defendants' October 3, October 10, and November 2, 2007, motions.
On December 1, 2007, the Quinns filed a reply certification in support of their November 2, 2007, motion for reconsideration of summary judgment. Plaintiff responded by demanding that defendants' motion *613 be withdrawn as frivolous. On December 7, 2007, the trial court denied defendants' motion for reconsideration. On December 17, 2007, plaintiff moved for a supplemental award of counsel fees and other relief. On January 23, 2008, the trial court denied plaintiff's application without prejudice due to insufficient documentation.
The Quinns filed a notice of appeal on February 8, 2008. In opposition, plaintiff filed a motion to dismiss or for partial remand. We dismissed the appeal as interlocutory on March 18, 2008. On April 24, 2008, we awarded plaintiff a counsel fee of $2,500 in connection with the appellate application.
On remand, plaintiff filed a motion for supplemental counsel fees on April 7, 2008. Defendants filed a certification in opposition on April 29, 2008. On June 5, 2008, the trial court entered a supplemental money judgment of $66,192.51 in favor of plaintiff. The order, signed by the court, stated that "such additional fees are compensable under the retainer agreements between the parties; and it further appearing that the same fees are further supported by Rule 1:4-8(d)." As already noted, the aggregate judgment is $163,745.93.
On May 20, 2008, the trial court ordered defendants to deliver subpoenaed documents and to appear at a supplementary proceeding deposition. This deposition has not yet taken place. On July 17, 2008, the Quinns filed this appeal.

B.
On appeal, the Quinns raise the following issues for our consideration:[4]
POINT I
THE LOWER COURT ABUSED ITS DISCRETION WHEN IT GRANTED [RESPONDENT'S] MOTION FOR SUMMARY JUDGMENT BECAUSE APPELLANTS WERE GIVEN NO OPPORTUNITY TO CONDUCT DISCOVERY.
POINT II
THE LOWER COURT ERRED WHEN IT HELD THAT APPELLANTS WERE LIABLE TO [RESPONDENT] FOR WITHDRAWAL AND COLLECTION FEES AS THESE WERE NOT AUTHORIZED BY THE SIGNED RETAINER AGREEMENT.
A. The Hidden Retainer was Unconscionable and Unenforceable.
B. An Attorney/Client Retainer Agreement is Not a "Regular" Contract.
POINT III
THE LOWER COURT ERRED WHEN IT DISMISSED APPELLANTS' COUNTERCLAIM.
In the Quinns' reply brief, they endeavor to raise the following points for our consideration:[5]
POINT I
THE TRIAL COURT'S RULINGS SHOULD BE REVERSED BECAUSE THEY WERE BASED UPON [RESPONDENT'S] MISREPRESENTATION ABOUT THE CONTENT OF THE SIGNED RETAINER AGREEMENTS.
POINT II
THE APPELLATE COURT SHOULD DENY [RESPONDENT'S] DISINGENUOUS *614 OFFER TO REDUCE ITS JUDGMENT BY $25,370.00 IN EXCHANGE FOR DISMISSAL OF APPEAL.
POINT III
APPELLANTS HAVE NOT "WAIVED SUBSTANTIAL ISSUES RAISED BELOW OR IN THEIR VARIOUS APPEAL PAPERS."
POINT IV
SUMMARY JUDGMENT WAS IMPROPERLY GRANTED WHEN THE TRIAL COURT FAILED TO EXAMINE ISSUES OF MATERIAL FACT.
POINT V
THE TRIAL COURT IMPROPERLY HELD DEFENDANTS LIABLE FOR COLLECTION FEES BASED UPON A DECEPTIVE RETAINER "REFERENCE" TO "DETAILS" AND "STANDARD BILLING PRACTICES AND FIRM POLICIES" WHICH WERE INACCURATELY STATED TO BE "AVAILABLE UPON REQUEST."
POINT VI
THE LOWER COURT ERRED WHEN IT DISMISSED APPELLANTS' COUNTERCLAIM.
POINT VII
REQUESTS FOR ADMISSIONS UNANSWERED BY A PRO SE LITIGANT DO NOT PROVIDE A BASIS FOR JUDGMENT.
Based upon our review of the prolix and verbose briefs and submissions in this matter, we discern that the issues raised fall within one of four distinct categories. The first issue centers on the enforceability of A.G.'s Master Retainer. The second issue focuses on whether summary judgment was appropriate, given the Quinns' claim that there was a lack of discovery and that material disputed facts existed at the time summary judgment was entered. The third issue deals with the appropriateness of the dismissal of the Quinns' counterclaim against A.G. and whether the lack of an affidavit of merit was an appropriate basis upon which to dismiss the counterclaim. Lastly, the fourth issue concerns the award of supplemental fees and whether those fees were recoverable as sanctions under Rule 1:4-8. We will address each of these categories seriatim.

C.
We begin our analysis by reviewing the nature of the attorney-client relationship.
There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.
[Stockton v. Ford, 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676, 682-83 (1850).]
"It is well-established that `[a] lawyer is required to maintain the highest professional and ethical standards in his dealings with his clients.'" In re Humen, 123 N.J. 289, 299-300, 586 A.2d 237 (1991) (quoting In re Gavel, 22 N.J. 248, 262, 125 A.2d 696 (1956)). Because "of the unique and special relationship between an attorney and a client, ordinary contract principles governing agreements between parties must give way to the higher ethical and professional standards enunciated by our Supreme Court." Cohen v. Radio-Electronics Officers Union, 275 N.J.Super. 241, 259, 645 A.2d 1248 (App.Div.1994), *615 modified, 146 N.J. 140, 679 A.2d 1188 (1996). Thus, "[a] contract for legal services is not like other contracts." Ibid.
Transactions between an attorney and a client are subject to close scrutiny by the court, and "the burden of establishing fairness and equity of the transaction rests upon the attorney." In re Gallop, 85 N.J. 317, 322, 426 A.2d 509 (1981). "Agreements between attorneys and clients concerning the client-lawyer relationship generally are enforceable, provided the agreements satisfy both the general requirements for contracts and the special requirements for professional ethics." Cohen, supra, 146 N.J. at 155, 679 A.2d 1188 (citing Restatement of the Law Governing Lawyers § 29A cmt. c (Proposed Final Draft No. 1 1996)). "An otherwise enforceable agreement between an attorney and client would be invalid if it runs afoul of ethical rules governing that relationship." Id. at 156, 679 A.2d 1188. "Consistent with the special considerations inherent in the attorney-client relationship, . . . the attorney bears the burden of establishing the fairness and reasonableness of the transaction. . . ." Ibid. (internal citations omitted).
An "[a]ttorney[] must never lose sight of the fact that the `profession is a branch of the administration of justice and not a mere money-getting trade.'" Kriegsman v. Kriegsman, 150 N.J.Super. 474, 480, 375 A.2d 1253 (App.Div.1977) (quoting Canons of Professional Ethics, No. 12). "[A]n attorney's freedom to contract with a client is subject to the constraints of ethical considerations and [the Supreme Court's] supervision." Cohen, supra, 146 N.J. at 155, 679 A.2d 1188. Further, the Court has made it clear it is committed to "preserving the fiduciary responsibility that lawyers owe their clients." Ibid.
"An agreement that violates the ethical rules governing the attorney-client relationship may be declared unenforceable." Tax Auth. v. Jackson Hewitt, 187 N.J. 4, 15, 898 A.2d 512 (2006). A court should construe an agreement between an attorney and a client "as a reasonable person in the circumstances of the client would have construed it." Restatement (Third) of the Law Governing Lawyers § 18 (2000).
An attorney then, when contracting for a fee, must act as a fiduciary and satisfy his or her fiduciary obligations to the client. Cohen, supra, 146 N.J. at 156, 679 A.2d 1188. The lawyer must explain at the outset the basis and rate of the fee the lawyer intends to charge. Ibid.
That requirement is embodied in R.P.C. 1.5(b), which provides that "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated in writing to the client before or within a reasonable time after commencing the representation." A.G. argues that is exactly what happened in this case. In the retainer letter dated January 6, 2006, it stated it would bill on an hourly basis and it set forth its hourly rates. A.G. argues that it literally complied with R.P.C. 1.5(b).
We disagree with A.G.'s extremely literal interpretation of R.P.C. 1.5(b). The ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93-379 (1993), makes it clear that "[c]onsistent with the Model Rules of Professional Conduct, a lawyer must disclose to a client the basis upon which the client is to be billed for both professional time and any other charges." (Emphasis added). The Committee stated "[a]t the outset of the representation, the lawyer should make disclosure of the basis for the fee and any other charges to the client." Id. (emphasis added); see Michels, *616 N.J. Attorney Ethics § 33:1 (2009) ("Thus, an attorney's ethical obligations in the fee context extend beyond the literal notice required by the rules and include a substantial amount of disclosure."); see also, Michels, N.J. Attorney Ethics § 33:4-1 (2009) ("The written statement required by R.P.C. 1.5(b) must disclose all charges for which the client will be financially responsible." (Emphasis in original)).
This broad interpretation of the rule is consistent with the reasons supporting the existence of the rule. The writing requirement is intended to avoid misunderstandings and fraud. Starkey v. Estate of Nicolaysen, 172 N.J. 60, 69, 796 A.2d 238 (2002).
Full and complete disclosure of all charges which may be imposed upon the client is also necessitated by R.P.C. 1.4(c). That reads, "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." If the client does not know what charges and costs beyond the hourly rate he may be exposed to, how can the client be expected to make an informed decision regarding representation. Merely directing the client to ask for another document that is not directly presented and explained to the client but will bind him or her does not fulfill the lawyer's obligation pursuant to R.P.C. 1.4(c). This obligation to thoroughly explain all the terms of retention is particularly appropriate, given that the lawyer has a unique and fiduciary relationship with the client. Cf., F.G. v. MacDonell, 150 N.J. 550, 563-64, 696 A.2d 697 (1997).
R.P.C. 7.1(a) also supports the need to fully disclose at the time of retention the significant terms which may financially affect the client. R.P.C. 7.1(a) provides an attorney "shall not make false or misleading communications about the lawyer, [or] the lawyer's services. . . . A communication is false or misleading if it: (1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading. . . ." Omitting significant costs and potential obligations that the client may owe his or her lawyer and referring to them as mere "details" in a standard policy statement may well be deemed materially misleading on an attorney's part.
Consequently, we reject the narrow and strained interpretation of R.P.C. 1.5(b) proffered by A.G. We hold that given the unique relationship between an attorney and a client, the fiduciary duty owed by an attorney to a client, as well as the need for a client to have complete information at the time of retention concerning the fees, charges, and obligations to be owed by a client to the attorney, that R.P.C. 1.5(b) requires an attorney to present a client the attorney has not regularly represented, in writing, at the time of retention, all of the fees and costs for which the client will be charged, as well as the terms and conditions upon which the fees and costs will be imposed. In that manner, the client can truly assent to the retention. The client will then be able to make an informed decision as to whether he or she desires to retain the attorney, and the chances for misunderstanding and fraud will be greatly diminished. Absent such complete detailed written disclosure presented to and assented to by the client, we hold that the attorney may not, consistent with R.P.C. 1.5(b), collect such fees and costs.
In the instant case, A.G. merely set forth the facts that billing would be on an hourly basis, what hours would be considered as billable, and the range of billable rates for the attorneys in the firm. While A.G. made reference to A.G.'s Master Retainer *617 (its "standard billing practices and firm policies"), which would provide details, nothing in that phrase would lead a reasonable client to conclude that it would be paying twelve percent interest on late charges, all collection fees, all fees for A.G. to withdraw from the representation, as well as secretarial overtime. A.G., by inviting the client to seek out A.G.'s Master Retainer instead of explaining the full terms of its retention, impermissibly shifted its fiduciary duty to the client and undermined the intent and purpose of R.P.C. 1.5(b).

D.
A.G. argues that a reference to A.G.'s Master Retainer in the January 6, 2006, retention letter appropriately incorporated those terms into the retainer agreement and that contract law obligates the Quinns to pay the sums due under those practices and policies. Plaintiff argues that defendants were "sophisticated" and experienced in bargaining with attorneys, and, therefore, the court should enforce the January 6, 2006, retainer agreement, including A.G.'s Master Retainer.
"[U]nder New Jersey law, two or more writings may constitute a single contract even though they do not refer to each other. Whether two writings are to be construed as a single contract, however, depends on the intent of the parties." Van Orman v. Am. Ins. Co., 680 F.2d 301, 306 (3d Cir.1982) (internal citations omitted). The basic question is whether the parties assented to a writing as the complete integration of their agreement. Lawrence v. Tandy & Allen, Inc., 14 N.J. 1, 7, 100 A.2d 891 (1953). We are unaware of any New Jersey court that has addressed the principle of incorporation by reference in depth. We note, however, that Williston has outlined the law on this point as follows:
Generally, all writings which are part of the same transaction are interpreted together. One application of this principle is the situation where the parties have expressed their intention to have one document's provision read into a separate document. So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, non-contemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned. . . . And, in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.
[4 Williston on Contracts § 30:25 (Lord ed.1999).]
In order for there to be a proper and enforceable incorporation by reference of a separate document, the document to be incorporated must be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had "knowledge of and assented to the incorporated terms."
Other jurisdictions have adopted the principles set forth in Williston. See PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir.1996) (recognizing that the common law requires the parties to have had knowledge of and assented to the incorporated terms, and requiring that the incorporated document be referred to and described sufficiently so that it may be identified beyond all reasonable doubt); Lamb v. Emhart Corp., 47 F.3d 551, 558 (2d Cir.1995) ("In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement *618 had knowledge of and assented to the incorporated terms."); Hertz Corp. v. Zurich Am. Ins. Co., 496 F.Supp.2d 668, 675 (E.D.Va.2007) (recognizing that "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms," stating that the identity of the secondary document must be readily ascertainable, and holding that "it cannot be said that the parties had agreed on the terms of a rental agreement at the time"); United States v. Agnello, 344 F.Supp.2d. 360, 369 (E.D.N.Y.2004) (following PaineWebber, supra, 81 F.3d at 1201, and requiring that it "be clear that the parties to the agreement had knowledge of and assented to the incorporated terms"); Ingersoll-Rand Co. v. El Dorado Chem. Co., 373 Ark. 226, 283 S.W.3d 191, 196 (2008) (stating that the incorporated document "must be described in such terms that its identity may be ascertained beyond reasonable doubt. Furthermore, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" (internal quotations and citations omitted)); W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 102 Wash.App. 488, 7 P.3d 861, 865-67 (2000) (quoting Williston and finding extrinsic evidence indicated that one of the parties was aware of the incorporated terms prior to signing the agreement); and Hous. Auth. of Hartford v. McKenzie, 36 Conn.Supp. 515, 412 A.2d 1143, 1145 (1979) ("The critical concern in determining the validity of the terms of a document incorporated by reference is whether the contracting parties knew of and assented to the additional provisions. The meeting of the minds and mutuality of assent are the most basic ingredients of a contract. Hence, the court, while willing to enforce the incorporated terms, will do so only when the whole writing and the circumstances surrounding its making evidence the parties' knowledge of and assent to each term."); but see, e.g., Wolschlager v. Fid. Nat'l Title Ins. Co., 111 Cal.App.4th 784, 4 Cal.Rptr.3d 179, 184-85 (2003) ("For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.")
In Kamaratos v. Palias, 360 N.J.Super. 76, 821 A.2d 531 (App.Div.2003), we dealt with the enforceability of an arbitration provision contained in a retainer agreement. In that case, the retainer agreement referred to the arbitration statute, but "it did not clearly state the consequences of an agreement to arbitrate disputes over legal fees." Id. at 87, 821 A.2d 531. We held that the attorney had an obligation to make a full disclosure to the client of the ramifications of the agreement to arbitrate and it was not sufficient that the client had experience in business so as to permit a conclusion that the client had made an informed decision to agree to proceed with arbitration in all instances. Ibid.
In this case, we find that the retainer agreement did not define with sufficient specificity A.G.'s Master Retainer, which is at issue in this dispute. The retainer agreement dated January 6, 2006, and signed by the Quinns on February 9, 2006, merely states that the client will be bound "by our standard billing practices and firm policies." This reference is in no way specific or identifiable such that the A.G. practices and policies "may be ascertained beyond doubt." The reference contained no document dates or an identifiable publication number; therefore, it fails the first prong necessary to incorporate A.G.'s Master Retainer by reference.
*619 Most importantly, moreover, there is no indication that the terms of the proposed incorporated document were known or assented to by defendants. To the contrary, it is without dispute that defendants were not shown and did not see the document until the fall of 2006. No one disputes that there was never any discussion concerning collection fees, interest on unpaid balances, or withdrawal fees between the parties until the relationship soured. Consequently, plaintiff's argument that contract principles support its position fails.

E.
Rule 4:42-9(a) provides that "[n]o fee for legal services shall be allowed in the taxed costs or otherwise, except" in certain circumstances enumerated in the rules or when fees are specifically authorized by statute. While counsel fees may be allowed where the parties have agreed thereto in advance in a contract, the strong public policy in New Jersey is against the shifting of counsel fees. See Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 402, 982 A.2d 420 (2009); In re Niles Trust, 176 N.J. 282, 293, 823 A.2d 1 (2003). Our Supreme Court has embraced that policy by adopting the "American Rule," which prohibits recovery of counsel fees by the prevailing party against the losing party absent an enforceable contract. Niles Trust, supra, 176 N.J. at 294, 823 A.2d 1. There is, therefore, a strong public policy against the award of collection fees by plaintiff, absent an enforceable contract for same.
A contract is unenforceable where contrary to public policy. Manning Eng'g, Inc. v. Hudson County Park Comm'n, 74 N.J. 113, 138, 376 A.2d 1194 (1977). While the best interests of society demand that persons should not be unnecessarily restricted in their freedom to contract, courts will not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403-04, 161 A.2d 69 (1960).
We have carefully balanced the policies emanating from the Rules of Professional Conduct in preserving strong confidence in attorneys and those supporting the "American Rule" against the public interest in the enforcement of the contractual provisions sought here and conclude that the provisions of A.G.'s Master Retainer sought to be enforced by plaintiff are unenforceable as violative of public policy because they were not disclosed in writing and given and explained to the client at the time of retention. See Briarglen II Condo. Ass'n, Inc. v. Twp. of Freehold, 330 N.J.Super. 345, 355-56, 749 A.2d 881 (App.Div.), certif. denied, 165 N.J. 489, 758 A.2d 648 (2000), overruled in part on other grounds by Ramapo River Reserve Homeowners Ass'n, Inc. v. Borough of Oakland, 186 N.J. 439, 896 A.2d 459 (2006).
In the instant matter, we find that plaintiff failed to appropriately comply with R.P.C. 1.5(b) with regard to sums sought under A.G.'s Master Retainer; that contract principles do not support the claim of plaintiff that it had an enforceable contract for such sums; and that there is also a strong public policy in fostering faith and confidence in our attorneys and enforcing the "American Rule," such that absent strict compliance with R.P.C. 1.5(b), and with an enforceable contract, the fees and charges under A.G.'s Master Retainer violate public policy; and, therefore, A.G.'s Master Retainer is not enforceable.
Consequently, we reverse the entry of judgment with respect to those sums purportedly authorized by A.G.'s Master Retainer. Plaintiff, therefore, shall only be *620 entitled to those sums set forth explicitly in the January 6, 2006, retainer agreement standing alone and not for any sums attempted to have been incorporated by A.G.'s Master Retainer. We remand the matter to the trial court to ascertain the appropriate sums due A.G. for its fees and expenses.

F.
Defendants argue that summary judgment should be set aside because there was a lack of opportunity to take discovery on defendants' part and that disputed facts existed. Rule 4:46-1 permits a party to move for summary judgment "at any time after the expiration of 35 days from the service of the pleading claiming such relief." The summary judgment motion, therefore, was not untimely. We note that at the time the motion was decided in October 2007, defendants had not engaged in any discovery.
"Where discovery on material issues is not complete, the respondent must, therefore, be given the opportunity to take discovery before disposition of the motion." Pressler, Current N.J. Court Rules, comment 2.3.3 to R. 4:46-2 (2009). However, a respondent to a summary judgment motion, who resists the motion on the grounds of incomplete discovery is obliged to specify the discovery that is still required. Trinity Church v. Lawson-Bell, 394 N.J.Super. 159, 166, 925 A.2d 720 (App.Div.2007). In this case, defendants did not set forth what discovery was still specifically required.
The trial court noted that defendants' opposition consisted of mere speculation and conclusionary statements. Rule 4:46-5(a) provides that in opposing summary judgment, "an adverse party may not rest upon the mere allegations or denials. . ., but must respond by affidavits meeting the requirements of Rule 1:6-6 or as otherwise provided in . . . Rule 4:46-2(b), setting forth specific facts showing that there is a genuine issue for trial." That did not occur in this case. There was no affidavit from anyone other than A.G. with respect to the reasonableness of the services rendered. The trial court appropriately recognized that it had the power and authority to review the reasonableness of the fees charged, but that it would ordinarily defer to the parties' agreement and the fee charged thereunder if it appears that they meet a prima facie test of fairness and reasonableness. See Gruhin & Gruhin, P.A. v. Brown, 338 N.J.Super. 276, 281, 768 A.2d 822 (App.Div.2001). If that test is met and the client utterly fails to come forward with anything of substance to rebut the prima facie showing and no expert is produced to challenge the invoice as unreasonable, the court appropriately should enforce the agreement. Ibid.
Defendants did not produce an expert to opine on the reasonableness of the services rendered. Defendants, here, are lay persons and are not expected nor do they have sufficient knowledge or experience to opine on the reasonableness of legal services. Cf., Kelly v. Berlin, 300 N.J.Super. 256, 267, 692 A.2d 552 (App. Div.1997). The trial court, therefore, appropriately found that there was no genuine material fact at issue. Further, it did not pass on the issue of lack of discovery because the issue was not presented to the trial court. We note that as the issue of lack of discovery was not presented to the trial court, we do not consider it on appeal. See Pressler, Current N.J. Court Rules, comment 2 on R. 2:6-2 (2009). Consequently, we find defendants' arguments that there was inappropriate discovery and *621 material issues of disputed fact to be without merit.

G.
We turn now to defendants' arguments that the trial court erred in dismissing their initial counterclaim, dismissing their motion to file a "supplementary" counterclaim, and dismissing both for lack of an affidavit of merit.
Defendants argue that pursuant to Rule 4:9-1, the trial court should have granted its application to amend its pleading as well as to add a revised counterclaim. Rule 4:9-1 permits a litigant "by leave of court which shall be freely given in the interest of justice" to amend its pleadings. "The motion for leave to amend is required by the rule to be liberally granted and without consideration of the ultimate merits of the amendment." Pressler, Current N.J. Court Rules, comment 2.1 on R. 4:9-1 (2009).
Amendments to pleadings, though, are addressed to the sound discretion of the trial court. Fox v. Mercedes-Benz Credit Corp., 281 N.J.Super. 476, 483, 658 A.2d 732 (App.Div.1995). The trial court denied the application for the amendment as late because it was an attempt, in the court's opinion, to relitigate the summary judgment that had just been entered. In this case, the proposed amendment embodied many of the same claims which the court had just decided and would be subject to the same defenses on which the court had ruled favorably for plaintiff. The defendants' proposed "supplemental" counterclaim is marginal at best. There was no abuse of discretion in not permitting it. Ibid. We, therefore, find no abuse of the court's discretion in denying the application to amend defendants' pleadings.
Defendants also argue that dismissal of their initial counterclaim was improper. We disagree. Defendants' opposition to plaintiff's motion to dismiss the initial counterclaim relied merely on defendants' pleadings and did not present the court with appropriate affidavits or citations to the record required by Rule 4:46-5(a) to demonstrate a genuine issue of material fact. With respect to defendants' allegations that A.G. breached its duty to them, defendants did not supply an expert's opinion. The opposition consisted merely of defendants' conclusionary statements and allegations.
An affidavit of merit, as required by the Affidavit of Merit statute, N.J.S.A. 2A:53A-27, was not supplied by defendants, as well. Defendants argue that the initial counterclaim was not one alleging malpractice but rather breach of contract. Our Supreme Court noted in Couri v. Gardner, 173 N.J. 328, 340, 801 A.2d 1134 (2002), that "[i]t is not the label placed on the action that is pivotal but the nature of the legal inquiry." The Court went on to say,
[a]ccordingly, when presented with a tort or contract claim asserted against a professional specified in the statute, rather than focusing on whether the claim is denominated as tort or contract, attorneys and courts should determine if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession. If such proof is required, an affidavit of merit is required for that claim, unless some exception applies.
[Ibid.]
In this case, a review of the initial counterclaim, as well as the proposed supplemental counterclaim, reveals that the factual allegations would require proof of a deviation from the professional standard of care applicable to attorneys. The pleadings refer to allegations that "the quality of work product was not sufficient," and that plaintiff "failed to do a complete and *622 competent job." We, therefore, agree with the trial court's analysis that an affidavit of merit was required to pursue this case.
No case management conference, however, as required by Ferreira, supra, 178 N.J. at 147, 836 A.2d 779, was conducted in this case. In Ferreira, our Supreme Court stated "going forward, we will require case management conferences in the early stage of malpractice actions to ensure compliance with the discovery process, including the Affidavit of Merit statute, and to remind the parties of the sanctions that will be imposed if they do not fulfill their obligations." Ibid. In its opinion, the Court stated:
[t]o ensure that discovery related issues, such as compliance with the Affidavit of Merit statute, do not become sideshows to the primary purpose of the civil justice system  to shepherd legitimate claims expeditiously to trial  we propose that an accelerated case management conference be held within ninety days of the service of an answer in all malpractice actions.
[Id. at 154, 836 A.2d 779.]
There is an issue as to whether the failure to hold the Ferreira conference within the ninety days required by the Court provides a litigant with additional time to comply with the Affidavit of Merit's time requirements. In Saunders ex rel. Saunders v. Capital Health Sys. at Mercer, 398 N.J.Super. 500, 510-11, 942 A.2d 142 (App.Div.2008), one panel of our court held that, where a Ferreira case management conference was not held and plaintiff's counsel did not discover until the motion to dismiss was filed that he had failed to provide defendant with the affidavit of merit he had in his file, it would be unfair to expose an attorney to potential professional liability where the court did not schedule the required conference within the appropriate time. The court stated that
because the particular circumstances giving rise to the dismissal of plaintiff's claim against Capital [a licensed healthcare facility] would have been averted had the case management conference been held, we conclude that plaintiff's professional negligence cause of action should proceed against both Capital and Cahill [Capital's employee] in its ordinary course.
[Id. at 510-11, 942 A.2d 142.]
In Paragon Contractors, Inc. v. Peachtree Condo. Ass'n, 406 N.J.Super. 568, 968 A.2d 752 (App.Div.), appeal granted by 200 N.J. 500, 983 A.2d 1109 (2009), another panel of our court held that Saunders was distinguishable from that case on its facts. In Paragon, the motion court found that the plaintiff was not in possession of an affidavit of merit within the 120 day period required by the statute, but plaintiff argued that it was not obligated to produce the affidavit of merit until the case management conference required by Ferreira  in effect, using the court's dictates in Ferreira as a tolling device for the filing of the affidavit of merit. Id. at 576, 968 A.2d 752. The Paragon panel pointed out that nothing in Ferreira required the tolling of the Affidavit of Merit statute deadline and observed that the deadline was one that was established by statute rather than by the Court. Id. at 583, 968 A.2d 752.
While an early case management conference may well have clarified for the defendants in this case the need to file an affidavit of merit, we agree with Paragon that the failure to conduct such a Ferreira conference does not toll the timeframes set forth in the Affidavit of Merit statute.
We hold that the requirement set forth in Ferreira for a case management *623 conference in malpractice actions is one intended to benefit the administration of justice and to assist the parties with an expeditious resolution of malpractice cases, as well as an attempt to reduce the flow of litigation that has arisen from the Affidavit of Merit statute. We do not discern that the Court's requirement vested any of the litigants with any additional rights. We note that litigants in malpractice actions still have available to them the two equitable remedies referred to in Ferreira if they have not timely complied with the statute. See Ferreira, supra, 178 N.J. at 151, 836 A.2d 779. If a plaintiff can show that he or she has substantially complied with the statute or if a plaintiff can show that there are extraordinary circumstances to explain non-compliance, relief is available. Ibid.
Accordingly, following the logic of Paragon, we find that the failure of the trial court to hold a Ferreira conference, standing by itself, did not excuse a failure to timely produce an affidavit of merit.

H.
Plaintiff argues that the supplemental award of $66,192.51 is supportable, not only as legal fees due under A.G.'s Master Retainer, but as a sanction pursuant to Rule 1:4-8(d)(2). Plaintiff also argues that defendants waived any appeal with respect to this issue because it was not briefed by them. With respect to the waiver issue, we note that the issue was in fact briefed in defendants' reply brief. Moreover, Rule 2:10-2 permits us to consider the issue on appeal in order to prevent an unjust result. See Otto v. Prudential Prop. & Cas. Ins. Co., 278 N.J.Super. 176, 181, 650 A.2d 832 (App.Div.1994), superseded by statute, N.J.S.A. 39:6A-4.3, as recognized by David v. Gov't Employees Ins. Co., 360 N.J.Super. 127, 136, 821 A.2d 564 (App.Div.2003).
Rule 1:4-8(a) sets forth what constitutes frivolous litigation. It includes pursuing litigation that has no legal basis, filing papers to harass or cause unnecessary delay, and it prohibits attorneys and parties, appearing pro se, from engaging in such conduct.
Rule 1:4-8(d)(2) provides that
[a] sanction imposed for a violation of paragraph (a) of this rule shall be limited to a sum sufficient to deter repetition of such conduct. The sanction may consist of . . . an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of a violation. . . . In the order imposing sanctions, the court shall describe the conduct determined to be a violation of this rule and explain the basis for the sanction imposed.
In the instant case, the trial court awarded plaintiff $66,192.51, both as legal fees and expenses due under A.G.'s Master Retainer and as a sanction under Rule 1:4-8(d)(2).[6] While the trial court listed each of the individual fees sought by A.G. for each of the applications it made and for opposing those made by defendants, the trial court did not "describe the conduct determined to be a violation of [the] rule [or] explain the basis of the sanction imposed" with reference to Rule 1:4-8(a) factors. There were then no findings of fact and conclusions of law in the record required pursuant to Rule 1:7-4(a) to support the Rule 1:4-8 award. More importantly, *624 there was no analysis as to whether an attorney appearing pro se may recover as a sanction "reasonable attorneys' fees."
Rule 1:4-8(d)(2) is patterned on Fed. R.Civ.P. 11. Pressler, Current N.J. Court Rules, comment 1 on R. 1:4-8 (2009). In fact, the original pertinent language of Fed.R.Civ.P. 11 is identical to our rule.[7] The Eleventh Circuit as well as a number of state courts with similar sanction provisions have held that the language of the rule itself precludes an award to a pro se attorney for his fees. Massengale v. Ray, 267 F.3d 1298 (11th Cir.2001). See DiPaolo v. Moran, 277 F.Supp.2d 528 (E.D.Pa. 2003); Musaelian v. Adams, 45 Cal.4th 512, 87 Cal.Rptr.3d 475, 198 P.3d 560 (2009); and Mikhael v. Gallup, 2006 Ohio 3917, 2006 WL 2141177 (Ohio Ct.App. 2006). We recognize that in a footnote in Port-O-San Corp. v. Teamsters Local Union, 363 N.J.Super. 431, 833 A.2d 633 (App.Div.2003), we noted that Rule 1:4-8 "does not prohibit an award of attorneys' fees to attorneys appearing pro se." Id. at 441 n. 5, 833 A.2d 633 (quoting Brach, Eichler, P.C. v. Ezekwo, 345 N.J.Super. 1, 17, 783 A.2d 246 (App.Div.2001) (dictum)). We disagree, however, with the comment in Port-O-San.
In Massengale, supra, 267 F.3d at 1302-03, the court found that under Fed. R.Civ.P. 11, an attorney could not recover legal fees when appearing pro se in a Fed.R.Civ.P. 11 application. The sanction imposed by Fed.R.Civ.P. 11 may include an "`order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of a violation.'" Id. at 1302 (quoting Fed.R.Civ.P. 11). The court noted that "[b]ecause a party proceeding pro se cannot have incurred attorneys' fees as an expense, a district court cannot order a violating party to pay a pro se litigant reasonable attorneys' fee as part of a sanction." Id. at 1302-03. The court observed that the word "attorney" generally assumes some kind of agency relationship. Id. at 1303 (quoting Ray v. U.S. Dep't of Justice, 87 F.3d 1250, 1251 n. 2 (11th Cir.1996)). The fees a lawyer might charge himself are not, strictly speaking, attorneys' fees and where a lawyer represents himself, legal fees are not truly a cost of litigation  no independent lawyer has been hired (or must be paid) to pursue a complaint.
Rule 1:4-8(d)(2), which uses the original language of Fed.R.Civ.P. 11, requires that the fees must be "incurred." See supra, note 7. The Federal Circuit, in construing Fed. R. Civ. P. 37, which was worded similarly to Fed.R.Civ.P. 11, noted incurred means "to have liabilities cast upon one by act or operation of law, as distinguished from contract, where the party acts affirmatively; to become liable or subject to." Pickholtz v. Rainbow Techs., 284 F.3d 1365, 1375 (Fed.Cir.2002) (quoting Black's Law Dictionary (abridged 5th ed.1983)). "Thus, one cannot `incur' fees payable to oneself, fees that one is not obligated to pay." Ibid.; see FMB-First Nat'l Bank v. Bailey, 232 Mich.App. 711, 591 N.W.2d 676, 680-83 (1998).
While it is clear that Rule 1:4-8 has a punitive purpose in seeking to deter frivolous litigation, it also seeks to compensate a party that has been victimized by another party bringing frivolous litigation. Deutch & Shur, P.C. v. Roth, 284 N.J.Super. 133, 141, 663 A.2d 1373 (Law Div. 1995). The rule, however, specifically permits *625 only the reimbursement of attorneys' fees and expenses incurred by a party. It does not permit the reimbursement of a party's loss of income in dealing with frivolous litigation. If a person, other than a lawyer, such as a doctor, plumber, or unskilled laborer, is the subject of frivolous litigation, appears pro se, and succeeds in convincing the court that his adversary has acted in a frivolous fashion, the court cannot, under the rule, reimburse the doctor, the plumber, or the unskilled laborer, the income he did not receive from his job. This rule simply compensates a party for the legal fees and expenses it actually incurred and became obligated for as a direct result of the adversary pursuing frivolous litigation.[8]
Public policy also supports our reading. To compensate an attorney for his lost hours would confer on the attorney a special status over that of other litigants who may also be subject to frivolous claims and are appearing pro se. There is nothing to indicate that that was the intent of the rule. As stated in Aronson v. U.S. Dep't of Hous. & Urban Dev., 866 F.2d 1, 5 (1st Cir.1989),
[n]or are we impressed by the argument that a pro se lawyer should be awarded fees because of the time he/she must spend on the case. The inference is that the time so spent means the sacrifice of fees he/she would otherwise receive. But a lay pro se must also devote time to the case. If such a litigant is a professional person, such as an author, engineer, architect, etc.[,] the time expended may also result in loss of income. Lawyers are not the only persons whose stock in trade is time and advice.
This concept was also articulated in Lisa v. Strom, 183 Ariz. 415, 904 P.2d 1239, 1243 (1995):
A non-lawyer pro se litigant, however, also suffers an "opportunity" cost, yet has no right to recover for his time spent preparing for litigation. Moreover, because of his unfamiliarity with the practice of law, a layman appearing pro se must spend more time preparing for the case than the lawyer appearing pro se. The time a layman spends in court preparing memoranda, investigating facts, is time when he cannot be practicing his own trade-but we do not allow him an award of fees for time spent working on the case because his recoverable attorney's fees are those he is reasonably obligated to pay his attorney, not his "opportunity" costs.
The judicial system would be unfair if an attorney-litigant could qualify for a fee award without incurring the potential out-of-pocket obligation that the opposing non-lawyer party must bear in order to qualify for a similar award. Moreover, when both parties opt to litigate pro se, it would be palpably unjust for one of them (the pro se lawyer) to be eligible for an attorney's fee award, while the other (the pro se layman) would not.
[(Emphasis in original).]
The plain language of the rule compensates a movant solely for reasonable attorneys' fees and other expenses incurred as a result of the frivolous claim. If reasonable attorneys' fees are not actually incurred by a litigant as a direct result of a frivolous claim, they are not compensable under the rule as presently written. We find, therefore, that an attorney appearing pro se is not entitled to fees unless they are actually incurred as opposed to imputed.
*626 Accordingly, the award on the basis of Rule 1:4-8(d)(2) is reversed and remanded based upon the language of the rule and the failure of the trial court to set forth findings pursuant to Rule 1:7-4. On remand, an application may be made for other expenses actually incurred as a direct result of the violation and awarded provided the court makes the appropriate findings.

I.
Based on our findings set forth above, we hold that: (1) the June 22, 2007, order denying without prejudice the Quinns' motion to vacate default against Quinn-Woodbine is affirmed; (2) the October 9, 2007, order entering summary judgment in favor of plaintiff and against defendants in the amount of $97,553.42 is affirmed in part and reversed in part. The liability of the Quinns to plaintiff for reasonable attorneys' fees and expenses arising out of plaintiff's representation of the Quinns in the Banc of America matters is affirmed. The amount of the award, however, is reversed and remanded to the trial court for a hearing. At the hearing, the trial court shall determine which sums represent legal fees and expenses incurred pursuant to the January 6, 2006, retention letter, exclusive of any sums which may have been due under A.G.'s Master Retainer. Hence, interest, collection fees, withdrawal fees, and the like are not to be included; (3) the October 29, 2007, order denying defendants leave to file a supplemental counterclaim and striking the initial counterclaim with prejudice is affirmed; (4) the December 7, 2007, order denying the Quinns' motion for reconsideration is affirmed; (5) the January 23, 2008, order denying without prejudice plaintiff's motion for a supplemental money judgment for additional counsel fees and other relief is affirmed; and (6) the June 5, 2008, order granting plaintiff's motion for a supplemental money judgment for additional counsel fees and other relief in the amount of $66,192.51 is reversed and remanded for a hearing at which time the trial court may, after reviewing our holding with respect to A.G.'s Master Retainer, determine whether the Quinns violated Rule 1:4-8 and, if so, what sanctions should be awarded under Rule 1:4-8(d)(2). Because we have held that the sums provided for in A.G.'s Master Retainer agreement may not be awarded as unenforceable and that legal fees, which plaintiff asserted are due it for its pro se representation, may not be recoverable under Rule 1:4-8(d)(2), should the trial court find sanctions should be awarded pursuant to Rule 1:4-8(d)(2), they would be limited to the other expenses actually incurred by plaintiff.[9]
Accordingly, with respect to the orders appealed from, we affirm in part, reverse in part, and remand for further proceedings consistent with our opinion. We do not retain jurisdiction.
NOTES
[1] The firm is now known as Alpert Butler & Weiss, P.C.
[2] Quinn-Woodbine Realty & Leasing Co., L.L.C. defaulted, and on May 18, 2007, plaintiff entered default against it. Quinn-Woodbine had filed an appeal, but its appeal was dismissed by us without prejudice on our own motion after we were informed that a bankruptcy petition had been filed involving Quinn-Woodbine.
[3] The Quinns claim that they did not observe the notice of fee arbitration when the materials were received by them because it was not placed in the front of the package. They alleged they saw the notice only when reference was made to it in the complaint A.G. later filed to collect its fees.
[4] The fourth point of the Quinns' appellate brief was withdrawn after the brief was filed.
[5] Technically, a new issue cannot be raised in a reply brief. See N.J. Citizens Underwriting Reciprocal Exch. v. Kieran Collins, D.C., LLC, 399 N.J.Super. 40, 50 (App.Div.), certif. denied, 196 N.J. 344, 953 A.2d 763 (2008).
[6] We have earlier in this opinion held that to the extent the award was made pursuant to A.G.'s Master Retainer, it is unenforceable. We note further that the award is also not sustainable as a quantum meruit recovery because the fees and expenses sought did not confer a benefit on defendants. See Starkey, supra, 172 N.J. at 68, 796 A.2d 238.
[7] Fed.R.Civ.P. 11 was amended on December 1, 2007, to read: ". . . an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." The changes in the rule resulting from this amendment were "stylistic only." Fed. R.Civ.P. 11, advisory committee note (2007).
[8] Our holding is directed solely to the language of Rule 1:4-8(d)(2), and we do not opine on the award of fees otherwise authorized by contract, rule, or statute.
[9] This opinion resolves all open motions.