**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5409-18

ST. LOUIS, LLC, and
JOHN BOULTON,

     Plaintiffs-Appellants,

v.

NAGEL RICE, LLC, BRUCE H.
NAGEL, ESQ., ELLIOTT L.
PELL, ESQ., GREENBAUM
ROWE SMITH & DAVIS, LLP,
DENNIS ESTIS, ESQ., ECKERT
SEAMANS, attorneys at law,
MICHAEL SPERO, and
NEIL DAY, ESQ.,

     Defendants-Respondents.

_____

Argued March 8, 2021 – Decided May 25, 2021

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0389-16.

Kenneth S. Thyne argued the cause for appellants (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, of counsel and on the briefs).

Thomas F. Quinn argued the cause for respondents Nagel Rice, LLC, and Bruce H. Nagel, Esq. (Wilson Elser Moskowitz, LLP, attorneys; Thomas F. Quinn, of counsel; Joanna Piorek and Susan Karlovich, on the brief).

Elliott Louis Pell, Esq., respondent, argued the cause pro se.

William D. Grand argued the cause for respondents Greenbaum Rowe Smith & Davis, LLP, and Dennis Estis, Esq. (Greenbaum Rowe Smith & Davis, LLP, attorneys; William D. Grand and Robert J. Flanagan, III, on the brief).

Marshall D. Bilder argued the cause for respondents Eckert Seamans, Michael Spero, and Neil Day, Esq. (Eckert Seamans Cherin & Mellott, LLC, attorneys; Marshall D. Bilder and Jason S. Feinstein, of counsel and on the brief).

PER CURIAM

This convoluted malpractice action arises out of plaintiffs' attempts to construct a two-story, 36,000 square-foot building with glass walls. On this nine million dollar project, John Boulton acted as general contractor. He established St. Louis, LLC to purchase the property and manage the construction. Boulton and his wife intended to use the building as a residence and office space for their charitable foundation. The project was never completed and plaintiffs eventually sold the property for $2.5 million.

I.

The Construction Litigation

Plaintiffs retained counsel – James Mackevich – to represent St. Louis, LLC in three separate construction defect lawsuits: (1) St. Louis, LLC v. Anthony & Sylvan Pools Corp. (Sylvan Pools); (2) St. Louis, LLC v. Final Touch Glass & Mirror, Inc. (Final Touch); and (3) St. Louis, LLC v. Bomanite of New Jersey (Bomanite). Our published opinion in the Final Touch lawsuit provides background information about the unique nature of the construction project underlying the three lawsuits. See generally St. Louis, LLC v. Final Touch Glass & Mirror, Inc., 386 N.J. Super. 177, 179-85 (App. Div. 2006).

All three lawsuits proceeded to a jury trial. In Sylvan Pools, the jury awarded plaintiffs approximately $35,000 in compensatory damages for their breach of contract claim and $750,000 for a violation of the Consumer Fraud Act,[1] which was trebled to $2,250,000. The court awarded $117,453.85 in attorney's fees. The defendant appealed from the final judgment; plaintiffs cross-appealed from a portion of the counsel fee award and the court's denial of prejudgment interest. We affirmed. St. Louis, LLC v. Anthony & Sylvan Pools

---

[1] N.J.S.A. 56:8-1 to -226.

Corp., No. A-3754-04 (App. Div. June 12, 2006) (slip op. at 3-4).

In Final Touch, the jury found defendant Final Touch forty percent negligent and third-party defendant Wolf, plaintiffs' construction manager, sixty percent negligent.[2]   386 N.J. Super. at 179-80.  Plaintiffs collected $400,000. We affirmed.  Id. at 181.

In Bomanite, the third lawsuit relating to the construction, the jury found plaintiffs were seventy-five percent responsible for the alleged damages, leaving Bomanite twenty-five percent liable for the damage to the property's custom HVAC unit.  The court ordered plaintiffs to pay Bomanite $100,000 for its trial expenses.  Plaintiffs only recovered about $100.  Plaintiffs did not appeal from the verdict.

<u>The Malpractice Action against Mackevich</u>

Dissatisfied with the outcome of the three lawsuits, plaintiffs retained Nagel Rice, LLP[3] to represent them in a legal malpractice action against Mackevich and his firm.  Pell was the primary attorney working on the case, supervised by Nagel.  Boulton prepared a forty-two-page memorandum for his

---

[2]  Wolf defaulted during the litigation.

[3]  We refer to Nagel Rice LLP, Bruce H. Nagel, and Elliot L. Pell as the Nagel Rice defendants.  Pell was no longer working for the firm at the time of this appeal.

new counsel detailing the history of the three construction defect lawsuits and Mackevich's alleged acts of malpractice.

Nagel Rice, in turn, retained defendant Dennis Estis of Greenbaum, Rowe, Smith & Davis LLP to serve as plaintiffs' expert in evaluating the merits of their claims against Mackevich. Estis sent Boulton an engagement letter and a retainer agreement that Boulton signed, agreeing to pay Estis a retainer and hourly rate.

The letter explained that Nagel Rice had retained Estis to evaluate the merits of the malpractice action against Mackevich, author an affidavit of merit, if appropriate, and serve as an expert witness on plaintiffs' behalf if Estis found a deviation from the standard of care required of an attorney in a construction defect case. The retainer agreement stated that "[t]he scope of the work is limited to that stated in our engagement letter and any enlargement of the scope authorized by the client(s) in writing or orally."

In November 2009, Estis met with Pell and Boulton and reviewed case-related documents, including a memo from the Nagel Rice defendants summarizing the malpractice claims. The following month, Pell forwarded Estis a draft affidavit of merit for all three construction defect lawsuits. Estis replied that he could not "opine with regard to the Bomanite matter" and revised the

5

affidavit to address Mackevich's malpractice only in the <u>Sylvan Pools</u> and <u>Final Touch</u> cases. Later in the litigation, Estis also prepared expert reports opining on the professional negligence claims in the two lawsuits. The affidavit of merit was filed on December 14, 2009.

During this litigation, Pell stated in a certification that Estis advised he could not provide an affidavit of merit in the <u>Bomanite</u> case without reviewing the trial transcripts. Pell stated that he asked Boulton for the transcripts and advised him of the time requirements to submit an affidavit of merit.

Estis confirmed he told Pell he could not sign an affidavit of merit without reviewing the <u>Bomanite</u> trial transcripts. In his certification, Boulton denied that Pell ever told him about the need for the transcripts or requested his "permission" to order the transcripts prior to the due date for the affidavit of merit.

Estis never received the transcripts or any additional information about the <u>Bomanite</u> lawsuit. The Nagel Rice defendants did not ask Estis to issue an affidavit of merit for that matter after he advised he could not do so. According to the first amended complaint, the deadline to file the affidavit of merit was March 18, 2010.

6

In July 2009, while still represented by the Nagel Rice defendants, Boulton retained Michael Spero, who then worked at Sterns & Weinroth, P.C., for "confidential consultations" regarding the Mackevich case because Boulton "started to distrust the Nagel firm and wanted to get . . . a reality check from another attorney."

A year later, in July 2010, Spero substituted in for Pell and Nagel Rice as counsel for plaintiffs and took over the Mackevich case. Under the retainer agreement, Spero and other attorneys would bill on an hourly rate, however, the legal fees were discounted by fifteen percent. The agreement also stated that the firm "bill[s] for out-of-pocket disbursements and certain other expenses and service charges" including photocopying and filing fees. Boulton "agree[d] to be personally responsible for the payment of legal fees and disbursements" and acknowledged that payment of same "is in no way contingent upon the outcome of a matter."

In 2013, Sterns & Weinroth merged its practice with Eckert Seamans Cherin & Melliott, LLC and Spero continued to work as a partner in the new

7

firm.[4]  In January 2014, Spero agreed to a reduction of his hourly rate with the continuation of the fifteen percent discount.

Spero described the Mackevich case as "enormously complex and extremely time-consuming."  He was required to familiarize himself with the three construction defect lawsuits and to review and organize more than thirty boxes of documents obtained from the Nagel Rice defendants.  Discovery involved "the exchange of thousands of pages of written discovery and [fourteen] days of depositions."  Because Boulton had "discarded" documents pertaining to the construction project, Spero stated he had to "reconstruct[]" the costs, which took him over a year to do.

Spero consulted with various experts regarding construction issues and kept Estis on board as plaintiffs' legal malpractice expert.  He spoke with Boulton weekly about the case, and billed for more than 200 telephone calls with him.[5]

While the Nagel Rice defendants were still representing plaintiffs, Mackevich moved to dismiss the Bomanite-related malpractice claim for

---

[4]  We refer to Spero, Neil Day, Esq., and the law firm collectively as the Eckert Seamans defendants.

[5]  Boulton routinely recorded his telephone calls with both Pell and Spero; the telephone transcripts were included in the record.

plaintiffs' failure to file an affidavit of merit.  Spero opposed the motion.  The court granted the motion, dismissing the <u>Bomanite</u> case.

Spero continued to prosecute the <u>Sylvan Pools</u>- and <u>Final Touch</u>-related malpractice claims on plaintiffs' behalf.  He participated in "extensive motion practice" on the case and attended two mediation sessions.

By the time trial took place in January 2015, Boulton and Spero had agreed to drop the "marginal" <u>Sylvan Pools</u> malpractice case and to only pursue the <u>Final Touch</u> malpractice claim.  The parties agreed to a bench trial.

After five days of trial, the court concluded that plaintiffs had not established that "Mackevich and his firm deviated in any way from acceptable standards of practice by an attorney."  In a lengthy written opinion, the court made findings and explained its conclusions.  The judge stated:

> Every bit of evidence that I heard and reviewed in this case demonstrates to me that Mr. Mackevich conducted the Final Touch litigation in a highly capable, thorough, and appropriate manner.  He used his judgment as attorneys must do in the trial of a case.  He thought about how he could be most credible in front of the jury. While he was wildly successful in representing [plaintiffs] in the [Sylvan Pools] case, the result in the Final Touch case was not what he or [plaintiffs] wanted. However, an attorney cannot guarantee what a jury will do, and obviously the Final Touch jury found some of the contentions of Final Touch's witnesses credible. That does not in any way indicate malpractice.  I find

> Mr. Mackevich performed at a level far above the average attorney.

In addition, the judge found Boulton lacked credibility and had "attempt[ed] to conspire . . . to cover up potential evidence" during the underlying Final Touch lawsuit which undermined his malpractice claim against Mackevich. The judge further found Estis's opinion that Mackevich was negligent was a net opinion and that Mackevich's expert was more credible and persuasive. The court concluded in stating that both parties in the Mackevich case were "very, very ably represented . . . in a professional manner . . . ."

### The Subject Malpractice Action

Plaintiffs filed a lengthy complaint against defendants alleging numerous causes of action. On appeal, plaintiffs only assert their claims of professional negligence against all defendants and their breach of contract claim against the Greenbaum Rowe defendants. Therefore, we need not address all of the original claims.

### The Nagel Rice Defendants' Motion to Dismiss

In their complaint, plaintiffs alleged that Nagel Rice was negligent in failing to obtain an affidavit of merit in the Bomanite case and in failing to properly defend plaintiffs against Mackevich's consequent motion to dismiss the complaint for lacking an affidavit of merit. The Nagel Rice defendants moved

10

to dismiss the claims, asserting that plaintiffs were considering a lawsuit against Nagel Rice for professional negligence during the pendency of the Mackevich case. Therefore, plaintiffs were obligated to file a Rule 4:5-1 certification. The Nagel Rice defendants contended plaintiffs' failure to file the certification substantially prejudiced their ability to defend themselves.

During discovery, documents revealed that Boulton and Spero talked "off and on for a few years" about suing the Nagel Rice defendants for legal malpractice in connection with the Mackevich case. In June 2010, Boulton began corresponding with Spero in writing about bringing a potential malpractice case against them.

Boulton wrote to Spero and asked: "If [the] Bomanite[-related malpractice claim is] dismissed because Pell didn't [serve an affidavit of merit], do we have a plausible reason to file a legal malpractice action against Nagel's firm?" A few days later, Boulton wrote to Spero again regarding Estis's failure to address the Bomanite claim in his affidavit of merit and asked: "Is this a big-time Nagel screw up" and "[d]oes this open Nagel's firm to a malpractice action? Please advise."

In July 2010, Boulton wrote Spero another letter with the header: "Reference: Possible Malpractice Action Against Pell/Nagel"; he also enclosed

11

a three-page memo "discuss[ing] the possibility of letting the Bomanite dismissal stand and subsequently filing a separate malpractice action against Pell/Nagel for negligence related to their work on the case." In August, Boulton wrote to Spero in reference to the "Twin Tracks to Separately Pursue Mackevich and Nagel/Rice", and again inquired whether "we have a case against Nagel/Rice", whether Spero could handle the case, and when it should be filed.

In October 2013, more than three years later, Spero wrote Boulton a detailed letter confirming their "conversations regarding our strategy with respect to a potential lawsuit against Nagel Rice, LLP." In that letter, Spero: (1) informed Boulton that "a prudent course of action to preserve [his] case against Nagel Rice would be to name Nagel Rice in what is referred to as a Rule 4:5-1 Certification"; (2) quoted the relevant portion of that court rule; (3) explained the rule's requirements in plain language; (4) detailed the strategic reasons for filing the certification versus not filing the certification; and (5) confirmed that he agreed with Boulton's decision not to file the certification.

After summarizing their discussion, Spero informed Boulton that "the strategy of what to do in this matter is a very close call, and in large part depends on how serious you are about suing Nagel Rice, and evaluating your potential award of damages in a suit against them." Spero stated:

> If you are strongly contemplating a suit against Nagel Rice, naming it in the instant matter in an abundance of caution will avoid later having to fight a motion brought by Nagel Rice to dismiss based on the decision to not name them in the [Rule] 4:5-1 Certification in the instant matter. If, however, you are unlikely to sue Nagel Rice, I caution against naming them in an amended [Rule] 4:5-1 Certification in the instant matter, for the reasons addressed above.

Spero confirmed that Boulton understood the issue and the risks involved with pursuing each course of action and that Boulton had decided not to file the amended Rule 4:5-1 certification. Spero said, "[g]iven the totality of the circumstances," he "agree[d] with this strategy."

The Nagel Rice defendants stated they were unaware of plaintiffs' contemplations until plaintiffs filed the complaint underlying this case in March 2016. In support of their motion to dismiss, the Nagel Rice defendants contended they were substantially prejudiced by the lack of notice because their malpractice insurance carrier subsequently denied them coverage for this claim since they had not identified the potential claim in their application for insurance coverage in January 2016. The insurer concluded that the Nagel Rice defendants had "a basis to believe that a claim would be pursued" as early as May 24, 2010, when the court dismissed the malpractice claim related to the Bomanite lawsuit for plaintiffs' failure to provide an affidavit of merit.

13

After Nagel Rice sought a declaratory judgment against its insurer in federal court and the insurer's motion to dismiss the complaint was denied, the insurer provided a defense to Nagel Rice and Bruce Nagel under a reservation of rights.

Pell certified that the lack of notice prevented him from advising Boulton to "preserve all [relevant] documents and materials" and from tracking the chain of possession of the construction defect lawsuit files that Boulton had transmitted back and forth between multiple law firms. Pell also produced deposition transcripts in which Boulton admitted "he destroyed many documents and commingled others, including evidence and potential evidence" in the Mackevich case and failed to produce relevant video evidence pertaining to one of the underlying construction defect lawsuits.

In an oral decision issued February 17, 2017, the trial court agreed that Olds v. Donnelly[6] did not require the mandatory joinder of the Nagel Rice defendants in the Mackevich case. Nevertheless, the court found plaintiffs were bound under Rule 4:5-1 to give the Nagel Rice defendants notice of a potential legal malpractice claim. The judge noted a violation of the rule could result in sanctions, including a dismissal of the complaint with prejudice if the non-

---

[6] 150 N.J. 424 (1997).

compliance was inexcusable and the non-disclosed party was substantially prejudiced. The court did not specifically find plaintiffs' failure to file the certification was inexcusable. But the judge did find substantial prejudice because the insurance carrier had not promised indemnification and Pell was not insured. In addition, the court noted that the allegation of destroyed evidence significantly prejudiced the Nagel Rice defendants. Therefore, the court granted the motion and dismissed the complaint with prejudice. A subsequent motion for reconsideration was denied.

### The Greenbaum Rowe Defendants' Motion for Summary Judgment

Plaintiffs' complaint alleged that Dennis Estis negligently performed his services as an expert and breached the contract between he and plaintiffs when he failed to provide an "appropriate" affidavit of merit for the Bomanite litigation. The Greenbaum Rowe defendants moved for summary judgment, asserting Estis did not have an attorney-client relationship with plaintiffs. In response, plaintiffs filed a cross-motion seeking leave to file an amended complaint alleging the Greenbaum Rowe defendants failed to disclose a conflict of interest regarding Mackevich and overbilled plaintiffs for Estis's expert reports.

A-5409-18

The trial court granted the summary judgment motion in an oral decision on March 31, 2017.  The judge found it was clear under the engagement letter that the Greenbaum Rowe defendants were retained to evaluate the merits of the underlying malpractice action and Estis would serve as an expert witness if he concluded there was a deviation from the applicable standard of care.  Therefore, because there was no attorney-client relationship between plaintiffs and the Greenbaum Rowe defendants, plaintiffs could not sustain their professional negligence action.  The court also denied plaintiffs' motion for leave to file an amended complaint.

### The Eckert Seamans Defendants' Motion for Summary Judgment

Plaintiffs' complaint also alleged professional negligence by the Eckert Seamans defendants.  Plaintiffs stated defendants breached their duty of fiduciary loyalty "by charging excessive legal fees . . . ," "overcharging for various tasks," "charging for work that failed to comply with accepted standards of care," and "charging for work that was inappropriate, unnecessary, and unreasonably expensive."  The Eckert Seamans defendants moved for summary judgment and asserted a counterclaim for their unpaid attorney's fees and costs totaling $81,997.40.  Plaintiffs requested a jury trial on the counterclaim.

A-5409-18

In February 2019, plaintiffs obtained two expert reports to support their malpractice claims against the Eckert Seamans defendants. Noel E. Schablik, Esq., addressed the hourly fee agreement claim and David H. Paige, Esq. opined on the overbilling claim.

### 1. The Schablik Report

Schablik, a certified civil trial attorney employed at Noel E. Schablik, P.A., opined that the Eckert Seamans defendants "deviated from accepted standards of care and violated their professional responsibility to Boulton" by: (1) failing to adequately explain the hourly fee agreement's material terms; (2) failing to adequately explain the effect the agreement would have on plaintiffs' recovery if successful in the litigation; (3) failing to inform Boulton of alternatives to an hourly fee agreement, such as a pure contingency agreement; and (4) failing to inform Boulton—before the fee agreement was executed—of the amount of fees and costs he would have to incur to prosecute his claims against Mackevich.

Although the hourly fee agreement at issue was executed in 2010, Schablik used a 2018 Appellate Division case, Balducci v. Cige, 456 N.J. Super. 219, 242-43 (App. Div. 2018), aff'd, 240 N.J. 574 (2020), as the legal framework for his opinion.

Schablik concluded that "[a] reasonable person informed of the potential recovery and advised of the amount of fees Spero would ultimately charge, as well as the astronomical amount of fees the expert would charge, would not have elected to retain Spero and his firm on an hourly basis." He stated that the "deviations" "were a substantial contributing factor in bringing about the damages suffered by [p]laintiff[s]" and that the hourly fee agreement was "unenforceable and void."

### 2. The Paige Report

Paige is a legal fee and insurance expert and founder of Legal Fee Advisors, a group of "legal fee analysts dedicated to the provision of expert testimony . . . ." At plaintiffs' request, he analyzed the Eckert Seamans defendants' bills for the Mackevich case "to determine whether such charges and billing practices are reasonable under applicable commercial, ethical and legal standards . . . ." He concluded that the Eckert Seamans defendants overbilled for their work and recommended that their fees be reduced "across-the-board" by approximately forty-five percent.

First, Paige found the fees should be reduced because they included "charges such as non-billable disbursements that are not commonly or reasonably reimbursable" and conflicted with "common commercial standards."

18

Second, he identified what he deemed to be "a number of intertwined and improper billing problems" such as: block billing, vague task descriptions, pattern billing, charges for administrative and/or clerical tasks, charges for travel, excessive and unreasonable charges for legal research in excess of three hours, billing entries where staff were overqualified for the identified task, and excessive internal conference charges. Third, he opined, based upon Schablik's report and opinion,

> that the [Eckert Seamans defendants] largely failed to perform [their] work with efficiency and professional expertise and should . . . have either referred the [Mackevich] Litigation to a firm with established expertise in the substantive areas of law involved here, or, at the very least, only assumed this retention on a contingency basis so as to shift the financial risk of prolonged litigation to [itself].

Paige appended a ten-page list to his report that repeatedly referenced "generally accepted commercial standards" from businesses such as K-Mart, Office Depot, and Xerox, along with published and unpublished federal and state cases. Although the list included a citation to RPC 1.5, Paige did not discuss the relevance of the rule or the cited cases.

In March 2019, the Eckert Seamans defendants moved for summary judgment, contending plaintiffs had not served an expert report to support their claims of professional negligence. In addition, the defendants asserted the

19

Schablik and Paige expert reports were inadmissible net opinion, requiring dismissal of the overbilling claims. The defendants also moved to strike plaintiffs' jury demand request on the overbilling claim.

In a written decision and order issued April 18, 2019, the trial judge found Schablik's and Paige's reports were net opinion. The judge stated: "[T]he two expert opinions seemingly ignore key evidence in the record that shows that Mr. Boulton was a sophisticated party, as evidenced by his extensive involvement in his various lawsuits."

The judge referred to communications between Spero and Boulton and found "an obvious intent on Mr. Boulton's behalf to be bound by an hourly agreement." She specifically noted Boulton's June 25, 2010 letter to Spero in which Boulton asked for a "reduced hourly rate" and acknowledged "it's clear that hundreds of billable hours will be needed in the next [two or three] years" on the Mackevich case. In the letter, Boulton advised he wanted the reduced hourly rate because he was "a good client" and "[he] pa [id] on time." The court also relied on Boulton's deposition testimony, in which he confirmed "that the finished negotiation was to keep the hourly rates in place" despite Spero's offer to handle the matter on a "modified contingency basis."

A-5409-18

The court continued, finding that "[e]ven when viewed in light most favorable to Mr. Boulton, the record[] shows that he was well aware of the consequences of pursuing a case on an hourly basis over a contingency basis" and that he "was in a better position, at the time he retained Mr. Spero, to know that the Mackevich Action would be an expensive endeavor, as he had been involved in various other lawsuits at the time." The judge did "not find any evidence that Mr. Boulton would have taken Mr. Spero's offer to represent him on a pure contingency basis." Therefore, the court concluded that "Mr. Schablik's expert opinion does not rest on a proper factual basis and constitutes a net opinion."

In turning to Paige's expert opinion, the court found that Paige "failed to provide an adequate justification for using commercial standards in the insurance billing context" as part of his analysis and "fail[ed] to address the relevant ethical rules regarding reasonableness of attorney's fees," RPC 1.5(a), which "are highly important to any analysis of attorney's fees." Thus, the court concluded that Paige's "report also constitutes a net opinion."

Having excluded the expert reports as inadmissible net opinion, the court then "viewed the remaining evidence in the record" and determined it did "not present a genuine dispute of material fact over the issue of whether Mr. Boulton

21

received inadequate advice to make the choice between a contingency basis and a[n] hourly basis" fee agreement. It found that Boulton "was aware of the difference between the two forms of legal billing." Therefore, the court granted the motion for summary judgment.

The Eckert Seamans Defendants' Counterclaim for Attorney Fees

Spero filed an affidavit of services pursuant to Rule 4:42-9(b) and RPC 1.5(a) in support of the Eckert Seamans defendants' counterclaim for unpaid attorney's fees and costs. The affidavit detailed his professional background (along with the backgrounds of the associates who assisted him), explained the discounted hourly rates the firm used when billing plaintiffs, and addressed the RPC 1.5(a) factors in detail. He wrote that "[s]ubstantial time and labor was required . . . to diligently represent plaintiffs" in the Mackevich case for four-and-a-half years, and that "[t]he amount of time required . . . was either the most or second most time [he] devoted to a single case" in his career. He added that "the factual and legal questions presented . . . were highly complex and required extensive research and analysis."

Spero also cited Boulton's acknowledgment that the matter "would require substantial billable hours" and "make him 'a major client'" and emphasized that Boulton had asked him to participate in weekly conference calls regarding the

case "in addition to other written and verbal communication[]" between them. In addressing the unfavorable outcome of the Mackevich case, Spero noted the trial judge's finding that Boulton's lack of credibility was "a major flaw" in plaintiffs' case.

Boulton submitted a certification in opposition to the affidavit of services and reiterated his request for a jury trial on the counterclaim. He relied on Paige's report, even though the court had already deemed it inadmissible net opinion. He said that Spero "exploited" him by "misinforming" him about the merits of his claims against Mackevich and his prospects of recovery even though the court had already rejected these contentions in granting the Eckert Seamans defendants' motion for summary judgment.

On July 2, 2019, the court awarded the Eckert Seamans defendants the full amount of fees sought. The order stated the court "considered the Affidavit of Services and any opposition thereto . . . ."

II.

On appeal, plaintiffs contend the trial court: (1) abused its discretion in granting the Nagel Rice defendants' motion to dismiss; (2) erred in granting summary judgment to the Greenbaum Rowe defendants; (3) erred in finding the Schablik and Paige reports were net opinion and granting the Eckert Seamans

23

defendants summary judgment; and (4) erred in granting summary judgment on the Eckert Seamans defendants' counterclaim.

## The Dismissal of the Nagel Rice Defendants

Plaintiffs contend the court erred in dismissing their claims against the Nagel Rice defendants because plaintiffs failed to file a Rule 4:5-1(b)(2) certification. Plaintiffs assert they were not required to file a Rule 4:5-1(b)(2) certification in the Mackevich case regarding a potential malpractice action. And if they were required to do so, the dismissal of their claims was an unwarranted sanction.

Relying on Olds, plaintiffs contend that legal malpractice actions need not be joined with the underlying actions from which they arise. In addition, plaintiffs assert their actions were excusable as supported by the court rules and case law, and that dismissal of the claims was unwarranted because the Nagel Rice defendants were not substantially prejudiced.

A trial court's imposition of sanctions for failure to comply with Rule 4:5-1(b)(2) is reviewed under an abuse of discretion standard. Karpovich v. Barbarula, 150 N.J. 473, 483 (1997). An abuse of discretion occurs if the court "failed to consider controlling legal principles . . . ." Ricci v. Ricci, 448 N.J.

Super. 546, 565 (App. Div. 2017) (internal quotation marks and citation omitted).

Rule 4:5-1(b)(2) states, in pertinent part:

> Each party shall include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other action or arbitration proceeding is contemplated; and, if so, the certification shall identify such actions and all parties thereto. Further, each party shall disclose in the certification the names of any non-party who should be joined in the action pursuant to R. 4:28 or who is subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification. The court may require notice of the action to be given to any non-party whose name is disclosed in accordance with this rule or may compel joinder pursuant to R. 4:29-1(b).

The disclosure requirement in the rule's first sentence "exists 'to implement the philosophy of the entire controversy doctrine.'" Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 109 (2019) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:5-1 (2019)). See Kent Motor Cars, Inc. v. Reynolds & Reynolds, Co., 207 N.J. 428, 444 (2011) (discussing 1998 amendments to Rule 4:30A intended "to limit

25

its scope to mandatory joinder of claims" and Rule 4:5-1(b)(2) intended "to address joinder of parties" by adding a disclosure obligation).

"The goals of the [entire controversy] doctrine are to promote judicial efficiency, assure fairness to all parties with a material interest in an action, and encourage the conclusive determination of a legal controversy." Olds, 150 N.J. at 431. "Rule 4:5-1(b)(2) facilitates those goals by requiring each party to certify with its first pleading whether the matter in controversy is the subject of any pending [or contemplated] litigation." Karpovich, 150 N.J. at 480.

The rule addresses when a court may impose sanctions for violation of its disclosure requirements:

> If a party fails to comply with its obligations under this rule, the court may impose an appropriate sanction including dismissal of a successive action against a party whose existence was not disclosed or the imposition on the noncomplying party of litigation expenses that could have been avoided by compliance with this rule. A successive action shall not, however, be dismissed for failure of compliance with this rule unless the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action.
>
> [R. 4:5-1(b)(2).]

In Olds, the Court held "that the entire controversy doctrine no longer compels the assertion of a legal-malpractice claim in an underlying action that

gives rise to the claim."  150 N.J. at 443; accord Dimitrakopoulos, 237 N.J. at 99.  Olds did not address whether the Rule 4:5-1(b)(2) disclosure requirement still applied in this context.  However, in Karpovich, decided the same day as Olds, the Court resolved this issue when it held that "the entire controversy doctrine does not compel either notice to the trial court of the possible legal-malpractice claim or the joinder of the attorney in the underlying action that gives rise to that claim."  150 N.J. at 476.

During oral argument before this court, counsel for the Nagel Rice defendants asserted that because the 1998 amendments to Rule 4:5-1(b)(2) did not explicitly exempt legal malpractice actions from the notice requirement, the rule remained applicable and plaintiffs were bound to notify them of a potential malpractice action.  We disagree.

The comments pertaining to the 1998 amendments state they were intended to require disclosure of all non-parties "who would have had to have been joined under the entire controversy doctrine."  Pressler, History and Analysis of Rule Amendments to R. 4:5-1 (www.gannlaw.com).  Rule 4:5-1(b)(2) was amended as a part of changes made to the Rules in 1998 regarding mandatory joinder.

However, the holdings of <u>Olds</u> and <u>Karpovich</u> were not affected by the 1998 amendments and remain the controlling law. The rationale behind the holdings remains true: there is no compelled joinder or notice of a potential legal malpractice claim to avoid placing a client in the untenable position of rendering his or her attorney an adversary during the attorney's representation and requiring the client to retain new counsel. Until a case is completely adjudicated, a client cannot know whether his or her attorney's representation was deficient. And until the litigation is concluded, a client need not make that decision.

Here, in granting the dismissal motion, the trial judge found that Boulton "was counselled" by his attorney that failure to file a <u>Rule</u> 4:5-1 certification "could lead to a dismissal with prejudice of his future claim" but nevertheless, he did not file the certification in the Mackevich case. Although the court did not make an explicit finding of whether the non-compliance was excusable, we could infer that finding. In addition, the court concluded that the Nagel Rice defendants had been "substantially prejudiced" because their malpractice carrier had not promised indemnification and certain "evidence was destroyed" which might hamper discovery in the subsequent malpractice action.

In reaching its determination, the trial court did not consider the controlling legal principle enunciated in Karpovich, where the Court held that the entire controversy doctrine does not compel notice to the trial court of any potential legal malpractice claim. 150 N.J. at 476. Therefore, plaintiffs' failure to file the Rule 4:5-1(b)(2) certification was excusable under the circumstances. Under the rule, dismissal is only available as a sanction if "the failure of compliance was inexcusable." R. 4:5-1(b)(2).

Although the issues raised by the Nagel Rice defendants regarding spoliation of evidence may have some merit, they do not warrant dismissal of plaintiffs' claims under Rule 4:5-1(b)(2). Once the claims are reinstated, "the trial court will be able to utilize all of the usual spoliation remedies . . . to ensure that the parties are proceeding on a level playing field . . . and to prevent [plaintiffs] from deriving a benefit from their destruction of that information." Kent Motor Cars, 207 N.J. at 449 (citations omitted). See State v. Saavedra, 222 N.J. 39, 70 (2015) ("In the event that a party is found to have committed spoliation of evidence, a range of sanctions is available under both our common law and Court Rules.").

Because the court misapplied its discretion in dismissing plaintiffs' claims against the Nagel Rice defendants, we reverse the February 17, 2017 order and remand that portion of the case to the trial court.

<u>The Greenbaum Rowe Defendants' Summary Judgment Motion</u>

We turn to plaintiffs' contentions that the trial court erred in granting the Greenbaum Rowe defendants' motion for summary judgment on the legal malpractice and breach of contract claims.

"In reviewing a grant or denial of summary judgment, [we are] bound by the same standard as the trial court under <u>Rule</u> 4:46-2(c)." <u>State v. Perini Corp.</u>, 221 N.J. 412, 425 (2015). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 528-29 (1995) (quoting <u>R.</u> 4:46-2(c)). The "competent evidential materials presented" must be "viewed in the light most favorable to the . . . non-moving party." <u>Id.</u> at 540.

To survive summary judgment on a legal malpractice claim, plaintiffs must demonstrate that "competent, credible evidence existed to support each of

the elements" of the claim. <u>Cortez v. Gindhart</u>, 435 N.J. Super. 589, 598 (App. Div. 2014). An action for legal malpractice is grounded in tort and has "three essential elements: '(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff.'" <u>Jerista v. Murray</u>, 185 N.J. 175, 190-91 (2005) (quoting <u>McGrogan v. Till</u>, 167 N.J. 414, 425 (2001)).

Here, plaintiffs failed to establish they had an attorney-client relationship with the Greenbaum Rowe defendants. The plain language of the engagement letter and retainer agreement clearly defined the scope of Estis's involvement in the Mackevich case as an expert witness only. Estis was not providing legal services; he was only retained to serve as plaintiffs' expert witness if he was able to determine that Mackevich's representation deviated from the applicable standard of care.

We have defined the attorney-client relationship in terms of a client relying upon the attorney's "guidance and advice." <u>Petit-Clair v. Nelson</u>, 344 N.J. Super. 538, 543-44 (App. Div. 2001). <u>See also</u> <u>In re Makowski</u>, 73 N.J. 265, 269 (1977) ("[O]ne who assumes to give legal advice takes on the role of

an attorney."). As stated, such a relationship is different from the one here as Estis was not retained to provide plaintiffs with legal advice and did not do so.

Plaintiffs' reliance on Petrillo v. Bachenberg, 139 N.J. 472 (1995), and Albright v. Burns, 206 N.J. Super. 625 (App. Div. 1986), for the proposition that Estis owed plaintiffs a legal or fiduciary duty despite the lack of an attorney-client relationship is misplaced, as those cases did not involve attorneys serving as expert witnesses.

In Petrillo, the Court held that an attorney for the seller of real estate had a duty not to negligently misrepresent the contents of a material document on which he knew or should have known that potential buyers might rely upon to their detriment. Id. at 489. In Albright, we held that an attorney for a decedent's estate owed a fiduciary duty to third-party estate beneficiaries "where the attorney had reason to foresee the specific harm which occurred." 206 N.J. Super. at 632-35.

Moreover, the Court has since explained that Petrillo and similar cases must be interpreted narrowly. See Green v. Morgan Props., 215 N.J. 431, 458-60 (2013) (advising that "although we have previously concluded that there are circumstances in which an attorney may be liable to third parties, each instance in which we have so held has been carefully circumscribed", and the Court's

32

"ordinary reluctance to permit non-clients to sue attorneys remains unchanged.").

We are satisfied the trial judge properly granted summary judgment as a matter of law because plaintiffs could not establish an attorney-client relationship and, therefore, could not sustain an action for professional negligence.

### Additional Claims against the Greenbaum Rowe Defendants

During oral argument on the summary judgment motion, the trial court correctly noted that plaintiffs not only alleged a legal malpractice claim against the Greenbaum Rowe defendants, but also alleged "breach of contract, breach of warranty, covenant of good faith and fair dealing, and respondeat superior . . . ."[7] However, the court only addressed the legal malpractice claim in its decision granting summary judgment.

During the argument, plaintiffs' counsel briefly mentioned the breach of contract claim. After the court granted the defendants summary judgment on the legal malpractice claim and turned to another motion, plaintiffs' counsel

---

[7] Plaintiffs' appellate brief also references overbilling, conflict of interest, and breach of fiduciary duty claims. These claims were not presented in the first amended complaint, and the trial court denied plaintiffs' motion to file a second amended complaint. Because these claims were not properly before the trial court for disposition, we do not address them here.

stated: "Your Honor, just, with respect, may I indicate to the extent that there is [sic] other causes of action with respect to [the] Greenbaum Rowe [defendants] that we suggest exist, may we make another application to the [c]ourt?" The court replied: "Not now."

Plaintiffs' appellate briefs discuss the merits of their breach of contract claim but do not mention the remaining claims. Because plaintiffs have not asserted on appeal that the court's failure to address the breach of warranty, covenant of good faith and fair dealing, and respondeat superior claims in its summary judgment decision constitutes error, we will not address them. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

The trial court did not make any findings regarding plaintiffs' breach of contract action against the Greenbaum Rowe defendants. A court is required to make factual findings and provide reasoning for its legal conclusions under Rule 1:7-4(a). See also R. 4:46-2. "Without the benefit of findings and conclusions", our review is impeded and we "can only speculate about the reasons for a trial court's decision." Rosenberg v. Bunce, 214 N.J. Super. 300, 304 (App. Div. 1986). Therefore, we are constrained to remand to the trial court for findings of

fact and conclusions of law as required under Rule 1:7-4(a) regarding plaintiffs' breach of contract claim against the Greenbaum Rowe defendants.

<u>The Eckert Seamans Defendants' Summary Judgment Motion</u>

We next consider plaintiffs' contentions that the court erred in finding its two expert reports were net opinion and in granting summary judgment on their malpractice claim for the Eckert Seamans defendants.[8] We begin with a review of the evidentiary issue followed by the summary judgment determination. <u>See</u> <u>Townsend v. Pierre</u>, 221 N.J. 36, 53 (2015).

A trial court's decision to exclude expert testimony in a civil case is reviewed under "a pure abuse of discretion standard . . . ." <u>In re Accutane Litig.</u>, 234 N.J. 340, 391-92 (2018) (citing <u>Townsend</u>, 221 N.J. at 52-53). Thus, the decision to exclude the expert reports of Schablik and Paige as net opinion "should not be disturbed on appeal unless the decision was 'made without a rational explanation, inexplicably departed from established practices, or rested

---

[8] Plaintiffs did not address the additional claims contained in their complaint including breach of contract, breach of fiduciary duty, breach of warranty and covenant of good faith and fair dealing, failure to supervise, and respondeat superior either during oral argument on the summary judgment motion or in their appellate briefs. Therefore, we will not consider those causes of actions. <u>See</u> <u>Sklodowsky</u>, 417 N.J. Super. at 657 ("An issue not briefed on appeal is deemed waived.").

on an impermissible basis.'" Est. of Kotsovska v. Liebman, 221 N.J. 568, 588 (2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

As with the other defendants, plaintiffs alleged the Eckert Seamans defendants were professionally negligent in representing them. Specifically, Schablik opined that Spero failed to adequately explain the terms of the hourly fee agreement and did not inform Boulton of alternatives to an hourly fee agreement such as a contingency agreement.

We have set forth above the three essential elements required to sustain a legal malpractice action. As this court has stated: "Expert testimony is required in cases of professional malpractice where the matter to be addressed is so esoteric that the average juror could not form a valid judgment as to whether the conduct of the professional was reasonable." Sommers v. McKinney, 287 N.J. Super. 1, 10 (App. Div. 1996). Typically, "[a]s 'the duties a lawyer owes to his [or her] client are not known by the average juror,' expert testimony must necessarily set forth that duty and explain the breach." Carbis Sales, Inc. v. Eisenberg, 397 N.J. Super. 64, 78 (App. Div. 2007) (quoting Stoeckel v. Twp. of Knowlton, 387 N.J. Super. 1, 14 (App. Div. 2006)). Accord Buchanan v. Leonard, 428 N.J. Super. 277, 288 (App. Div. 2012).

At issue here is the scope of an attorney's duties pertaining to the negotiation of fee agreements and reasonable fees. We have stated that the retainer agreement is the "bedrock" of the attorney-client relationship. Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 518 (App. Div. 2009). "Because 'of the unique and special relationship between an attorney and a client, ordinary contract principles governing agreements between parties must give way to the higher ethical and professional standards enunciated by our Supreme Court.'" Id. at 529 (quoting Cohen v. Radio-Elecs. Officers Union, Dist. 3, 275 N.J. Super. 241, 259 (App. Div. 1994), modified, 146 N.J. 140 (1996)).

"Attorneys and clients can agree to fee arrangements of their choice, provided they do not violate the Rules of Professional Conduct." Balducci v. Cige, 240 N.J. 574, 597 (2020). "The paramount principle guiding every fee arrangement is that '[a] lawyer's fee shall be reasonable.'" Id. at 592 (quoting RPC 1.5(a)) (alteration in original). "The most conventional fee agreement is for a client to pay an attorney on an hourly basis." Id. at 597. "[I]n many cases, an hourly-fee arrangement may better serve the client's interests than a contingent-fee arrangement—provided the client has the resources to pay the hourly fee." Id. at 600.

Under RPC 1.5, lawyers have a duty to "present a client the attorney has not regularly represented, in writing, at the time of the retention, all of the fees and costs for which the client will be charged, as well as the terms and conditions upon which the fees and costs will be imposed." Alpert, 410 N.J. Super. at 532. "The client will then be able to make an informed decision as to whether he or she desires to retain the attorney, and the chances for misunderstanding and fraud will be greatly diminished." Ibid.

"Agreements between attorneys and clients concerning the client-lawyer relationship generally are enforceable, provided the agreements satisfy both the general requirements for contracts and the special requirements of professional ethics." Cohen, 146 N.J. at 155. When a fee dispute arises, courts "ordinarily defer to the parties' agreement and the fee charged thereunder if it appears that they meet a prima facie test of fairness and reasonableness." Alpert, 410 N.J. Super. at 538. "If that test is met and the client utterly fails to come forward with anything of substance to rebut the prima facie showing and no expert is produced to challenge the invoice as unreasonable, the court appropriately should enforce the agreement." Ibid.

"N.J.R.E. 703 addresses the foundation for expert testimony." Townsend, 221 N.J. at 53. "[A]n expert's opinion must be based on 'facts, data, or another

expert's opinion, either perceived by or made known to the expert, at or before trial.'" Carbis Sales, 397 N.J. Super. at 78-79 (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 201 (App. Div. 2002)). "[A] trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011).

"Under the 'net opinion' rule, an opinion lacking in such foundation and consisting of 'bare conclusions, unsupported by factual evidence' is inadmissible." Carbis Sales, 397 N.J. Super. at 79 (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)). "The rule requires an expert 'to give the why and wherefore' of his or her opinion, rather than a mere conclusion." Ibid. (quoting Jimenez v. GNOC Corp., 286 N.J. Super. 533, 540 (App. Div. 1996)). "In the context of legal malpractice, an expert must base his or her opinion on standards accepted by the legal community and not merely on the expert's personally held views." Ibid.

We are satisfied the trial court did not abuse its discretion when it determined that the opinions offered by Schablik and Paige were inadmissible net opinions because they were not based upon facts contained in the record and were premised upon inapplicable legal standards.

Schablik supported his opinion regarding the hourly fee agreement with this court's holding in Balducci v. Cige, 456 N.J. Super. 219, 242-43 (App. Div. 2018). He specifically relied on this court's imposition of new requirements and ethical obligations for attorneys handling fee-shifting cases.

This matter is neither an LAD case nor a statutory fee-shifting case. Thus, the legal framework that Schablik utilized as a basis for his findings and conclusions is inapplicable. As discussed above, Alpert explains the scope of a lawyer's duty to inform the client "in writing, at the time of retention, all of the fees and costs for which the client will be charged, as well as the terms and conditions upon which the fees and costs will be imposed." 410 N.J. Super. at 532. Moreover, in 2020, the Supreme Court disagreed with many of the Appellate Division's "pronouncements" in Balducci that "purportedly impos[ed] new ethical obligations on attorneys handling LAD and other fee-shifting claims" and directed that a new ad hoc committee "address the professional-responsibility issues discussed . . . ." Balducci, 240 N.J. at 581, 606-07.

Furthermore, as the trial court found, Schablik's conclusion that Boulton "was not sufficiently informed to decide whether to accept or reject the proposed fee agreement," is unsupported by the factual record. As stated, Spero gave Boulton a written retainer agreement that thoroughly explained he would be

billed hourly, disclosed all applicable hourly rates for Spero, associates, and paralegals, and confirmed that all legal fees would be discounted by fifteen percent. It disclosed that Boulton would be billed for out-of-pocket disbursements and other expenses and charges, including photocopying and filing fees. It also made clear that payment of all fees and disbursements "is in no way contingent upon the outcome of a matter" and that a late payment charge would accrue at the rate of one percent per month if any bill is unpaid after sixty days. The correspondence between Boulton and Spero confirmed that the two men had discussed the billing arrangement at length. Boulton requested the hourly fee retainer and Spero agreed to give him a discounted rate.

Contrary to Schablik's position, neither the RPCs nor the applicable case law at the time of the retainer required the agreement to "provide an estimate of the total fees and expenses to be incurred in prosecuting the matter" or to "reference any estimate of the potential recovery" or to "provide Boulton with an estimate of the value of the claim against Mackevich or the collectability of the claim." Indeed, in Balducci, the Court acknowledged that "[e]stimating the value of the case or the number of attorney hours that ultimately will be expended may not be possible with precision" and that "[e]stimating expenses likewise depends on whether a case settles early or goes the distance." 240 N.J.

41

at 602-03.  Nevertheless, Spero was in constant communication with Boulton, on at least a weekly basis, as well as at the mediation sessions and several times thereafter, about the case value and potential collectability as the litigation progressed.

In addition, Boulton was a sophisticated client and very much involved in negotiating the fee agreement with Spero.  See id. at 593 ("In determining the validity of a retainer agreement, a court may consider the circumstances related to the making of the agreement, including whether the parties 'actually negotiated the agreement,' 'the client's level of sophistication or experience in retaining and compensating lawyers,' and other relevant factors.").  The record reflects that in verbal and written communications with Spero, Boulton expressed a clear understanding of the differences between an hourly fee agreement and a contingency fee agreement and assumed an active role in negotiating the fee agreement.  He specifically asked Spero for an hourly fee agreement and, in that written request, acknowledged that his complex case would generate hundreds of billable hours over the next two or three years.

Schablik asserts that a March 2010 telephone call during which Spero expressed a personal opinion about contingent fee arrangements in response to Boulton's dissatisfaction with the Nagel Rice defendants constituted advice that

A-5409-18

dissuaded him from executing a contingent fee agreement with Spero. However, that conversation did not involve the subsequent fee negotiations that took place between Boulton and Spero. If anything, it further demonstrated Boulton's experience with retaining prior attorneys on a contingent fee basis and underscored that he understood the differences between hourly fee and contingent fee arrangements.

We also note the trial court's determination that Schablik's opinion that "[a] reasonable person informed of the potential recovery and advised of the amount of fees Spero would ultimately charge, as well as the astronomical amount of fees the expert would charge, would not have elected to retain Spero and his firm on an hourly basis" lacked a proper factual basis. In addition to proffering a personal viewpoint, the opinion is undercut by the concession in Schablik's report that Boulton had the option of retaining another attorney on a contingency basis but declined to do so.

In turning to Paige's expert report addressing the reasonableness of the fees, we also discern no error in the court's conclusion that the expert's opinion was not based "on standards accepted by the legal community", because he relied on commercial billing standards to form his analysis. Carbis Sales, 397

N.J. at 79.  Furthermore, Paige failed to apply or analyze RPC 1.5(a), which sets forth the factors to be considered in determining the reasonableness of a fee.

As our Supreme Court has stated, "the RPCs guide attorneys and the courts with regard to proper conduct and can be relevant to the standard of care in civil cases against attorneys."  Meisels v. Fox Rothschild LLP, 240 N.J. 286, 299 (2020).  Paige's report did not address the complexity of the Mackevich case at all.  He compared the fees billed by the Eckert Seamans defendants with fees customarily charged in a commercial setting.

We see no abuse of discretion in the court's determination that Schablik's and Paige's expert reports were inadmissible net opinion.

Without expert opinion, plaintiffs could not establish the essential element that Spero and the Eckert Seamans defendants breached a duty owed to plaintiffs arising out of the attorney-client relationship with respect to the hourly fee agreement negotiations or the reasonableness of the fees charged.  See Carbis Sales, 397 N.J. Super. at 78 ("As 'the duties a lawyer owes to his [or her] client are not known by the average juror,' expert testimony must necessarily set forth that duty and explain the breach."); Alpert, 410 N.J. Super. at 538 (absent production of "an expert to opine on the reasonableness of the services rendered", the trial court "appropriately found that there was no genuine material

fact at issue").  Therefore, the trial court correctly determined that the Eckert Seamans defendants were entitled to judgment as a matter of law.

<u>The Eckert Seamans Defendants' Counterclaim</u>

Plaintiffs contend the trial court erred when it granted the Eckert Seamans defendants' counterclaim for unpaid attorney fees and costs by "rubber-stamp[ing]" Spero's affidavit of services and by "unconstitutionally depriv[ing]" plaintiffs of their right to a jury trial.

"[A] lawyer's bill for services must be reasonable both as to the hourly rate and as to the services performed.  That is not only the lawyer's legal obligation but his ethical one as well."  <u>Gruhin & Gruhin, P.A. v. Brown</u>, 338 N.J. Super. 276, 280 (App. Div. 2001) (citing RPC 1.5 and <u>Rosenberg v. Rosenberg</u>, 286 N.J. Super. 58, 69 (App. Div. 1995)).  <u>Accord</u> <u>Giarusso v. Giarusso</u>, 455 N.J. Super. 42, 50-51 (App. Div. 2018).

After granting summary judgment to the Eckert Seamans defendants on their counterclaim, the court stated it would subsequently "make a determination as to the reasonableness of Mr. Spero's attorney's fees."  Spero subsequently filed an affidavit of services in support of the counterclaim.  However, the July 2, 2019 order of judgment, which awarded the Eckert Seamans defendants the

full amount of fees sought, states only that the court "considered the Affidavit of Services, and any opposition thereto . . . ."

As stated earlier, Rule 1:7-4(a) requires the court to "find the facts and state its conclusions of law thereon in all actions tried without a jury, [and] on every motion decided by a written order that is appealable as of right . . . ." The findings and conclusions must be "sufficient to afford a meaningful review" on appeal. Finderne Heights Condo. Ass'n v. Rabinowitz, 390 N.J. Super. 154, 165 (App. Div. 2007). "The absence of adequate findings . . . necessitates a reversal . . . ." Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996).

Once the court found Paige's expert report was inadmissible net opinion, there was no longer a triable issue for a jury to decide. See Alpert, 410 N.J. Super. at 538 (explaining that lay persons lack "sufficient knowledge or experience to opine on the reasonableness of legal services" and that absent production of "an expert to opine on the reasonableness of the services rendered", the trial court "appropriately found that there was no genuine material fact at issue").

However, the court still had an obligation to make findings and conclusions in accordance with Rule 1:7-4(a) regarding the reasonableness of the fees. Gruhin, 338 N.J. Super. at 281. Without such findings, we cannot

46

meaningfully perform our review. In remanding to the trial court, we discern no need for a plenary hearing. The record presented to the trial court, including the affidavit of services, was "sufficiently complete to enable [the court] to reach a fair determination as to the extent of the legal services rendered . . . ." Cohen v. Fair Lawn Dairies, Inc., 44 N.J. 450, 452 (1965).

Therefore, we reverse the July 2, 2019 order and remand for the trial court to enter findings of fact and conclusions of law on the counterclaim in accordance with Rule 1:7-4. Giarusso, 455 N.J. Super. at 54.

In sum, we reverse the February 17, 2017 order dismissing the legal malpractice and other related claims against the Nagel Rice defendants and remand for further proceedings. We affirm the March 31, 2017 order granting the Greenbaum Rowe defendants' motion for summary judgment on the legal malpractice claim but remand for findings of fact and conclusions of law on the breach of contract claim.

We affirm the April 18, 2019 order granting the Eckert Seamans defendants' motion for summary judgment on the legal malpractice claims. We reverse the July 2, 2019 judgment for the Eckert Seamans defendants on their counterclaim and remand for findings of fact and conclusions of law.

A-5409-18

Affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5409-18